Argued and submitted December 15, 1986, affirmed May 6, reconsideration denied
June 26, petition for review denied August 24, 1987 (304 Or 55)

# MACLEAN & ASSOCIATES, INC.,
## *Respondent,*

*v.*

# AMERICAN GUARANTY LIFE
# INSURANCE COMPANY,
## *Appellant.*

## (A8305-02985; CA A38056)

736 P2d 586

Robert J. Miller, Sr., Beaverton, argued the cause for appellant. With him on the briefs were Brien F. Hildebrand, Beaverton, and Moomaw, Miller & Reel, Beaverton.

Susan Marmaduke, Portland, argued the cause for respondent. With her on the brief were Jack F. Olson, Portland, and Olson & Marmaduke, Portland.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

This is a breach of contract action. Defendant American Guarantee Life Insurance Company appeals from a judgment awarding plaintiff $233,465.50 in lost profits and $49,899.54 in attorney fees. Defendant makes five assignments of error, most of which have multiple arguments. We affirm.

At the time of the contract, defendant owned a resort and surrounding property near Mt. Hood, which it later developed into the Rippling River Resort. It consists of a "lodge center," which is operated as a hotel, and privately owned condominiums and homes. While the resort was under construction, Thomas MacLean, plaintiff's president, met with two of the developers and proposed to install a cable system which could provide Portland television channels, FM radio signals, a cable movie channel, a security system, a fire alarm system, an energy management system and closed-circuit television. Over the next six months the parties negotiated an agreement.

On April 6, 1979, plaintiff and defendant executed an "Exclusive Franchise Agreement" that provided, in relevant part:

"1.　*Definitions.* As used herein, the following words shall have the following meanings:

"\* \* \* \* \*

"f.　'Basic Services' means the providing of the television system for all the commercial and public television stations in the Portland, Oregon area, and the providing of FM radio signals from all the Portland, Oregon area FM radio stations.

"g.　'Optional Services' means the providing of first-run movie productions, the providing of energy conservation and control system, the providing of automated electric meter reading system, and any additional cable and/or computer related services which may be needed or desired at the time.

"\* \* \* \* \*

"2.　*Exclusive Franchise.* American hereby grants to MacLean the exclusive rights to install at Rippling River a coaxial cable network and related equipment capable of providing the Basic Services and the Optional Services and to operate a commercial enterprise at Rippling River for the

purpose of providing the Basic and Optional Services. American shall not sell, grant, agree to, or in any way encourage the providing of like or similar services within Rippling River during the term hereof, unless this Agreement is terminated as provided in Paragraph 9 hereof.

"* * * * *

"4.    *Installation.* At its own cost and expense, MacLean shall furnish to the lot line of each lot and to the border of each tract in Rippling River the coaxial cable necessary to perform the Basic Services hereinunder and such coaxial cable shall be laid below ground. For installation of service to the various homes and condominiums from the principal distribution system laid at MacLean's expense, MacLean shall be entitled to charge to each owner of a lot or condominium an installation charge in accordance with the schedule attached hereto, marked 'Exhibit A' and hereby made a part hereof. With respect to any installation MacLean will provide a performance bond, or its equivalent, satisfactory to American.

"* * * * *

"6.    *Additional Obligations of MacLean.* Subject to reasonable periods for repair and maintenance, MacLean is obligated to deliver at all times to all termination points of the network VHF television signals of at least such quality and reliability as are considered standard for the cable television industry. Reference Exhibit 'A', Section IV, attached hereto. In addition, MacLean shall offer the materials and labor needed for the installation of cable television and related services shall be of the quality generally found in the industry and such installation shall be made timely. Furthermore, MacLean shall operate and maintain the cable system installed within Rippling River through a commercial enterprise to be established for this purpose. All expenses including taxes levied by various governmental authorities shall be for the account of, and paid in a timely manner by MacLean.

"* * * * *

"9.    *Termination.* The injured party may terminate this Agreement upon ten (10) days written notice under any of the following conditions:

"A.    The failure of MacLean to install the required electronic network and equipment or failure of MacLean to deliver required services when any condominium or residence structure is ready for occupancy or failure of MacLean to comply with the material covenants of this Agreement. In

determining any breach herein for failure to provide the services to the individual units, it is agreed that MacLean is working with the developers who are developing the property by phase and that MacLean's performance herein shall be coordinated with such development. In the event that American claims a breach for failure to deliver the required services, an independent, qualified, [sic] impartial consultant, acceptable to both parties, shall be employed to render an opinion as to any such breach. Such independent party shall render an opinion within 20 days following such employment and if the opinion of such consultant is that MacLean has failed to deliver the required services, then MacLean shall, within 30 days thereafter, correct such deficiencies subject, however, to the availability of equipment. MacLean shall make, at its cost, any corrections that are necessary to bring the quality of services to the required standard. Parties agree that the standard for determining an acceptable level of service for cable TV is set forth in Exhibit 'A' and the Federal Communications Commission Summary of Technical Standards (FCC:376.605), 1978, attached hereto as Attachment 'B.' Such standards may be periodically amended by the FCC to reflect advancing technology. The applicable standards for other basic and Optional Services are set forth in Attachment 'C.' All charges arising from retention of a consultant shall be borne by American, except where said independent study establishes a violation of the technical standards set forth in Attachment 'B,' or MacLean otherwise fails to perform under the terms hereof, in such case or cases, then such charges will be borne by MacLean.

"* * * * *

"10. *Indemnity.*

"* * * * *

"B. If American terminates this Agreement for any cause listed in Paragraph 9A above, MacLean agrees to abandon any and all his [sic] interests in those material [sic] and equipment required to provide cable television service only, in favor of American. These shall include the cable network installed underground throughout the Rippling River development, the underground pedestals and all cable between the pedestals and living units. These shall further include any interest MacLean may have in the wiring internal to the living units and the smoke detectors and other sensing devices within the living units.

"* * * * *

"11. *General Operational Description.* Exhibit 'A' attached hereto provides a general description of the planned operational capabilities contracted for herein. It is intended as descriptive material only, and does not alter the contractual performance requirements established in Attachments 'B' and 'C'.

"12. *Attorney Fees.* In the event suit or action is instituted to enforce any provision of this Agreement, the prevailing party shall be entitled to reasonable attorney fees, including fees upon any appeal."

On June 20, 1979, Thomas MacLean wrote to the president of Red Lion, the resort's management company, regarding the cable system. In that letter, he described the services available with the cable system that plaintiff was installing and how the system would work. Plaintiff installed underground cable networks running directly to the lodge and condominium units. It also installed electronic equipment in the "lodge center" and other units as they were being completed. It was not registered with the Builders Board when it did the installation. Plaintiff used signals provided by Warner Cable as its signal source. It planned to install an independent system at a later date. Plaintiff installed an FM radio receiver, but the receiver was not operational in 1982. It also installed break-in sensors on the doors and windows in each condominium and special smoke detectors. In June, 1982, the computer to operate the security and fire-alarm systems was operational in two of the eight buildings, but had not yet been programmed in the other six. Thomas MacLean testified that only a small amount of work was necessary to make the security and fire-alarm system work.

On June 23, 1982, defendant sent plaintiff a 10-day notice that it was terminating the franchise agreement. The letter stated that defendant was invoking the 10-day provision, because plaintiff had failed to install the required equipment in that, among other things, it

"Failed to install an FM radio system pursuant to the Agreement.

"* * * * *

"Failed to install equipment for the receipt of satellite television signals, and failed to install proper amplification equipment.

"* * * * *

"Failed to provide equipment for the receipt of quality color television.

"Failed to provide equipment and installation of a system providing for security, energy conservation closed circuit television and video communication channel.

"Failed to provide the cable television systems, security systems, and FM radio systems within the time provided for in the Agreement * * *."

Plaintiff filed this action.

In the trial to the court, defendant offered a letter written before the execution of the agreement which explained the services available to the resort. Defendant also offered the June 20, 1979, letter that Thomas MacLean had written to the resort manager after the contract was signed. The trial court ruled that the latter letter was not admissible. Thomas Mac-Lean testified about the loss of profits due to the termination. Plaintiff's cable television expert, Schrock, testified about the reasonableness of Thomas MacLean's calculations of charges and expenses. Defendant did not present any evidence on the lost profits issue. The trial court held that defendant had breached the contract by not following the 30-day cure provision and awarded plaintiff $233,465.50 in lost profits.[1] By subsequent order, the court also awarded plaintiff $49,889.54 in attorney fees and costs.

Defendant contends that the trial court erred in denying its motion to dismiss, because plaintiff was not registered with the Builders Board at the time when it commenced this action. Plaintiff had been registered with the Builders Board from October 4, 1979, to August 22, 1980. This action was commenced on May 11, 1983. Defendant argues that ORS 701.065 prohibits plaintiff from bringing this action, because it was a builder within the meaning of the statute, see ORS 701.005(2), and the resort units were residential structures. Plaintiff argues that, because the action was based on an agreement for an exclusive franchise, it sought damages for its lost profits, not for its costs and expenses in the installation of

_____

[1] We assume that fact issues were resolved in favor of plaintiff. We review for substantial evidence and errors of law. *Cobra Building and Devel. v. City of Salem,* 59 Or App 441, 651 P2d 150, *rev den* 294 Or 295 (1982).

the cables and electronic devices, and, therefore, that the action does not involve a transaction that is within the scope of the Builders Board statutes. The trial court held that the registration requirements were inapplicable to plaintiff's performance of the agreement.

■        When this action was commenced, ORS 701.065 provided:

> "A builder may not file a lien or bring or maintain in any court of this state a suit or action for compensation for the performance of any work or for the breach of any contract which is subject to this chapter, unless he was registered under this chapter at the time he bid or entered into the contract for performance of the work."[2]

In *Wills v. Harris,* 57 Or App 712, 646 P2d 39, *rev den* 293 Or 483 (1982), we recognized that ORS 701.065 bars only certain kinds of actions and does not bar foreclosure of a trust deed.

> "What is it that this statute specifically precludes? In plain terms, it precludes unregistered builders from filing liens or bringing or maintaining suits or actions 'for compensation for the performance of any work or for the breach of any contract which is subject to this chapter * * *.' The phrase 'which is subject to this chapter' modifies both 'work' and 'contract.' Thus, builders seeking compensation for the *type*

---

[2] ORS 701.065 was amended by Or Laws 1983, ch 616, § 8, which became effective October 15, 1983. It now provides:

"(1) A builder may not file a lien, file a claim with the Builders Board or bring or maintain in any court of this state a suit or action for compensation for the performance of any work on a residential structure or for the breach of any contract for work on a residential structure which is subject to this chapter, unless the builder was:

"(a) Registered under this chapter at the time the builder bid or entered into the contract for performance of the work; and

"(b) Registered continuously while performing the work for which compensation is sought.

"(2) A court may choose not to apply this section if the court finds that to do so would result in a substantial injustice to the unregistered builder."

Plaintiff filed its complaint on May 11, 1983. It argues that, if the statute applies, it is the 1983 version, which allows the court to permit the maintenance of an action if a "substantial injustice" would otherwise result, which governs in this case. Defendant argued that the 1979 version of the statute applied. The trial court stated that, if the registration requirements did apply, it would apply the 1983 version of the statute and that substantial injustice would result if plaintiff were not allowed to sue. Because we hold that the action is not limited by any version of the statute, we do not reach that issue.

of work or for breach of the *type* of contract the legislature intended to be covered by the statute must have complied with the registration requirements." 57 Or App at 715. (Emphasis in original.)

In this case, as in *Wills*, the action is not for compensation for improvements made.[3] Although the franchise agreement could not be implemented without the installation of the wiring in the resort's residential units, the agreement was not a construction contract. Plaintiff bore the expense of the equipment and the installation. It sought damages for lost profits due to the breach of a franchise agreement. The trial court did not err in denying defendant's motion to dismiss.

Defendant next contends that the trial court erred in holding that the franchise agreement only required plaintiff to provide the "basic" services, *i.e.*, the Portland area television stations and FM radio signals. It argues that plaintiff obligated itself without limitation to provide the "basic" services to all of the residents and to provide the "optional" services to any of the residents who requested them. In the alternative, it argues that the circumstances surrounding the formation of the contract show a latent ambiguity concerning plaintiff's obligation to provide "optional" services and that the contract should be construed to require plaintiff to provide those services. Plaintiff argues that the contract is not ambiguous, that the only "promissory language" in the agreement is the language concerning the "basic" services and that the "optional" services portion of the contract gave it the exclusive right to provide those services, but did not obligate it to do so. The trial court concluded that the only promissory language is in paragraphs 4 and 6 of the agreement and that "Exhibit A" was not part of the contract.[4]

---

[3] Plaintiff's alternative plea for restitution was not the basis for the judgment, and the trial court did not consider the installation or equipment costs in its damage award.

[4] Defendant argues that "Exhibit A" was an integral part of the contract and that its terms created a patent ambiguity about plaintiff's obligation to provide the "optional" services. At trial, both parties acknowledged that the language in paragraph 4 referring to "Exhibit A" as being part of the contract was a scrivener's error and that it should have read "Attachment A." Paragraph 11 provides that "Exhibit A" is "intended as descriptive material only and does not alter the contractual performance requirements * * *." The trial court correctly considered "Exhibit A" as evidence of the circumstances surrounding the formation of the contract and not as part of the contract.

The construction of a contract is a question of law. *Timberline Equipment v. St. Paul Fire & Mar. Ins.,* 281 Or 639, 643, 576 P2d 1244 (1978). Whether a contract is patently ambiguous or, in the light of the surrounding circumstances, latently ambiguous also is a question of law. *Oakridge Cablevision v. First Interstate Bank,* 65 Or App 640, 646, 673 P2d 532 (1983). In interpreting a contract, we consider the instrument as a whole, rather than its isolated clauses. *Deerfield Commodities v. Nerco, Inc.,* 72 Or App 305, 319, 696 P2d 1096, *rev den* 299 Or 314 (1985).

■    The evidence indicates that, before the execution of the agreement, the parties discussed the various types of "optional" services that might be provided. None of the evidence clearly indicates that either party intended that plaintiff would be obligated to provide any or all of those "optional" services. Rather, the evidence is consistent with the language in paragraph 4, which states that plaintiff "shall" provide the cable necessary to perform the "basic" services. The only other promissory language in the contract appears in paragraph 6, which also deals with the obligation to provide the "basic" services. There is no language in the contract obligating plaintiff to provide the "optional" services. The trial court was correct in concluding that the language of the contract, and the circumstances surrounding its execution, gave plaintiff the exclusive option to provide the "optional" services, but did not require it to do so.

Defendant contends that the trial court erred in excluding Thomas MacLean's June 20, 1979, letter to the resort management. It argues that that letter is not barred by the Parol Evidence Rule, because it was written subsequent to the execution of the contract, and that it is evidence of plaintiff's conduct in connection with the contract which shows the intent of the parties regarding the "optional services." Plaintiff argues that any error in not admitting the letter was harmless. This was a trial to the court. The trial judge stated that, if the letter had been admitted, it would not have affected the outcome of the case because it is consistent with the trial court's interpretation of the contract. We agree.

■    Defendant next contends that the trial court erred in concluding that plaintiff had substantially performed its obligations under the contract. In order to recover damages for

breach of contract, the party seeking to recover must prove that it has substantially performed its own obligations under the contract. *Wasserberger v. American Scientific Chemical,* 267 Or 77, 82, 514 P2d 1097 (1973). We measure plaintiff's performance against its duties under the contract. As stated above, plaintiff was required to provide only the "basic" services. Paragraphs 4 and 6 require it to provide all Portland area television signals and FM radio signals. When defendant terminated the agreement, plaintiff was providing the required television services,[5] although it was not using its own signal source. The contract did not require that plaintiff establish its own source, although it was prepared to switch to its own source less than one month after the termination. The FM radio equipment had been installed. However, plaintiff was not providing FM signals to the individual residential units, because its FM receiver was not picking up FM signals. Thomas MacLean testified that the receiver needed to be moved and that, if someone had requested it, the signal could have been available within eight hours. There is substantial evidence in the record to support the trial court's conclusion that plaintiff had substantially performed its obligations to provide the "basic" services. We find no error.

Defendant next contends that the trial court erred in concluding that defendant had improperly terminated the franchise agreement. Defendant argues that it was permitted to use the 10-day termination clause, because plaintiff had failed to install the equipment necessary for the FM radio signals and that the 30-day cure clause applies only to problems with the quality of the services provided. Plaintiff contends that the unilateral termination on 10 days' notice violated the terms of the agreement. Plaintiff contends that it had installed the equipment required for the "basic" services. The trial court found that plaintiff had installed the required equipment.[6]

---

[5] Defendant argues that the quality of the signal was poor. The standards for judging the quality of the television reception were set out in "Attachment B" to the agreement. There was evidence that the signal was tested in the spring of 1982 and that it met or exceeded the standards set out in the attachment. Defendant complained of "ghosting" problems with the pictures. The standards do not deal with that particular problem.

[6] The trial court also concluded that, whether defendant's dissatisfaction was with the failure to install equipment or with poor service, defendant's right to terminate the agreement unilaterally and thereby force a total forfeiture of plaintiff's investment

■ The only equipment that plaintiff was obligated to install was the equipment necessary to provide the "basic" services. The cable wires had been installed, and the necessary electronic equipment was in place for the television reception. The FM receiver had been installed, although it had to be moved. Defendant's arguments that the television reception was poor and that the security, fire alarm and other systems were not available do not change the result. The quality of the television reception is a service issue governed by the 30-day cure clause. The other services are "optional." There is substantial evidence in the record to support the trial court's conclusion that plaintiff had provided the necessary equipment and that the real reason defendant terminated the contract was dissatisfaction with the quality of the services provided. The trial court did not err in holding that defendant improperly terminated the agreement when it failed to give plaintiff 30 days to correct the problems.

Defendant also contends that the trial court erred in awarding plaintiff damages for lost profits. It argues that Thomas MacLean was not qualified to testify as an expert about the lost profits and that the fact that he operated the business alone is not sufficient to make him an expert.

■ ■ The determination of whether a witness is qualified to testify as an expert is within the sound discretion of the trial court and will not be overturned except for an abuse of that discretion. *Myers v. Cessna Aircraft,* 275 Or 501, 519, 553 P2d 355 (1976); *State v. Caulder,* 75 Or App 457, 706 P2d 1007, *rev den* 300 Or 451 (1985). Thomas MacLean has education in business economics and management, experience in an engineering firm and other "start up" projects and three years of experience at the Rippling River Resort. The trial court did not abuse its discretion in finding him to be qualified to testify as an expert about lost profits in this business venture.

Defendant asserts that the evidence regarding lost

could well render the termination clause unconscionable.

The parties argue at length about whether the trial court's statement that it is arguable that the 10-day termination provision applies to failures to install equipment makes the clause ambiguous and whether our review of its meaning is a question of fact or one of law. Because we conclude that plaintiff did provide the equipment and that the termination was based on a dissatisfaction with the services, we do not reach this issue.

profit damages was wholly speculative and lacked sufficient support for the court to award damages. It argues that the resort was not as successful as anticipated, that plaintiff over-estimated its income, because its estimates of the number of subscriptions was overstated, that it underestimated its expenses and that, if plaintiff had continued to operate at the resort, it would have suffered a loss. Plaintiff argues that it presented sufficient evidence and clearly supported its figures. The trial court concluded that plaintiff had sustained its burden of proving lost profits.

■    We have held:

"When an award for lost profits is challenged on appeal, our task is to determine whether the evidence before the trier of fact was sufficient to establish in the mind of a reasonable person that a loss of profit probably occurred." *Jack Jacobs, Inc. v. Allied Systems Co.,* 68 Or App 554, 558, 683 P2d 1010, *rev den* 298 Or 37 (1984).

If it is shown that a loss of profits probably occurred, mere uncertainty as to the exact amount lost will not preclude recovery. *Krause v. Bell Potato Chip Co.,* 149 Or 388, 394, 39 P2d 363 (1935); *see Welch v. U.S. Bancorp,* 286 Or 673, 705, 596 P2d 947 (1979). We find no basis for concluding that the evidence, taken as a whole, is clearly insufficient to establish plaintiff's claim for lost profits.

■    Thomas MacLean testified regarding the existence of and measure of lost profits, the projected number of subscribers and the probable expenses of operating the system. Schrock, plaintiff's cable expert and project consultant, also testified about the reasonableness of plaintiff's projected revenues and expenses. The trial court held four separate hearings on the question of lost profits. It concluded that plaintiff had understated its probable expenses and revised that figure in determining the lost profits damages. We agree with the trial court that plaintiff "probably" would have suffered some lost profits. *See Welch v. U.S. Bancorp, supra,* 297 Or at 704; *Kimball v. Little River Lumber,* 44 Or App 497, 502, 606 P2d 660, *rev den* 289 Or 155 (1980). The evidence was sufficient for the trial court to determine the amount of damages. There is no error.

Defendant contends that the trial court erred in

awarding attorney fees that included fees for plaintiff's corporate counsel and an associate attorney who observed the trial. There is evidence in the record to support the award. We find no abuse of discretion. *See Kashmir v. Patterson,* 43 Or App 45, 51, 602 P2d 294 (1979), *aff'd* 289 Or 589, 616 P2d 468 (1980).

Affirmed.