[No. B081122. Second Dist., Div. Seven. Mar. 28, 1996.]

POSTAL INSTANT PRESS, INC., Plaintiff and Respondent, v.
SUE SEALY et al., Defendants and Appellants.

## COUNSEL

William P. Tedards, Jr., Thomas V. Girardi and James B. Kropff for Defendants and Appellants.

Joel P. Schiff, Paul A. Pavlis, Thomas M. Regele and James H. Berry for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Defendants appeal from a judgment in favor of plaintiff for breach of a franchise agreement. In what apparently is a case of first impression not only in California but the entire nation we consider whether a franchisee's failure to timely pay some past royalty fees entitles a franchisor to both terminate the franchise agreement and receive an award of over seven years in "future lost royalties." We conclude the franchisee's breach was not the "proximate" or "natural and direct" cause of the franchisor's loss of *future* royalties in this case. Furthermore, in the circumstances of this case, these damages are "excessive", "oppressive", and "disproportionate" to the loss. Accordingly we hold these lost future royalties are not a proper element of contract damages in the circumstances of this case.

### FACTS AND PROCEEDINGS BELOW

Respondent and plaintiff Postal Instant Press, Inc. (PIP) is an internationally known franchisor of printing businesses. In 1979 PIP entered into a 20-year franchise agreement with appellants and defendants, Sue and Steve Sealy (collectively the Sealys). PIP agreed to provide its trademark and

certain services to the Sealys in exchange for royalty fees of 6 percent of gross revenues and advertising fees of 1 percent of gross. According to the franchise agreement the Sealys were to pay these fees to PIP monthly.

Among its other terms, the lengthy franchise agreement also lists a number of possible failures on the part of the franchisee, any one of which would constitute a "material breach." In the event the franchisee commits a "material breach" the franchisor is entitled to "[t]erminate this Agreement, and thereafter bring such action . . . and to recover such damages, including but not limited to the benefit of its bargain hereunder. . . ." One of these "material breaches" is any failure to make a monthly royalty or advertising fee within 10 days after notice it is unpaid.

This 20-year franchise agreement remained in effect for almost 13 years. In the late 1980's, however, the Sealys failed to timely make several of their monthly royalty and advertising fee payments. The Sealys paid some of these fees late and PIP negotiated a note with the Sealys covering other overdue payments. Then in 1991, the Sealys again failed to make several of these regular payments and fell delinquent on the note as well.[1] Ultimately, on January 22, 1992, PIP declared the overdue payments for past royalties constituted a material breach and sent the Sealys a termination letter. In pertinent part this letter advises the Sealys: "You are no longer authorized to hold yourself out as a Postal Instant Press ('PIP') franchisee, to hold out your business as a PIP store, to conduct business under the PIP name, to perform any act that might tend to give the public the impression that you are operating a PIP Store, to use any of the PIP trade and service marks . . . ."

Elsewhere this termination letter warns the Sealys to "CEASE . . . IMMEDIATELY" conducting any operation as a print shop and refers to a noncompete clause found in paragraph VIII of the agreement. (Respondent concedes this "non-compete" clause is invalid under public policy and does not seek to enforce it in this case.)

One month later, on February 28, 1992, PIP filed a breach of contract action against the Sealys. In this action, PIP sought $77,300 in unpaid past

---

[1]Appellants included several depositions and other evidence in the record on appeal suggesting many, if not most, PIP franchisees, not just the Sealys, became delinquent in their royalty payments in the late 1980's and early 1990's. They also included evidence in the record suggesting these delinquencies may have been caused, in part at least, by failures on the part of the franchisor, PIP Printing. Such a pattern, if proved, may have had some relevance to our disposition of this appeal. However, appellants failed to present this evidence at the trial of this cause, but instead only submitted it in opposition to the motion for summary judgment. Accordingly, we do not consider it in deciding this appeal, which is from the trial, and not the summary, judgment.

royalties (including the sum which had been reduced to a note) along with interest, attorney fees and costs. In addition, the franchisor sought "future royalties and payments for the remaining unfulfilled term of the Franchise Agreement in the principal amount of at least $495,699."

After a bench trial, the court awarded PIP a total of $432,510.35 plus prejudgment interest, attorney fees, and expenses and costs. The court measured the expectation damage award according to unpaid royalty and advertising fund contributions from the date of termination through the remainder of the contract term, a period of seven and one-half years. Based upon defendants' sales history, sales figures from 1990 and 1991 were averaged and, without applying any inflation or growth factor, PIP deducted its incremental costs of performance and discounted the amount to present value or $301,334. Thus, the "estimated future profits" damages represent over two-thirds of the total judgment.

Appellants do not dispute the portion of the judgment representing damages for past royalty and advertising fees they owe and thus those damages are not a part of this appeal. However, appellants do challenge the trial court's award of unpaid future royalty and advertising fees for the remaining term of the franchise agreement, a period of almost eight years. This portion of the award is $301,344 and is the subject of this appeal.

## DISCUSSION

### I. *Scope of Appellate Review*

This appeal does not implicate either an abuse of discretion or sufficiency of the evidence standard of review. Instead it involves, first, an issue of contract interpretation and, second, a pure legal issue of contract remedies. ■ An appellate court appropriately conducts a de novo review of a trial court's interpretation of the language of a contract (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839] [in construing terms of contract, the reviewing court "must make an independent determination of the meaning"]; see also 9 Witkin, Cal. Procedure (3d. ed. 1985) Appeal, § 295, and cases cited therein). An appellate court obviously also makes its own judgments about the nature of the law. Accordingly, we proceed to undertake an independent inquiry as to the terms of the contract and the law of contract damages.

### II. *Breach of Contract Damages for "Lost Future Expected Profits" Are Limited to Those the Loss of Which Are "Proximately Caused" and a "Natural And Direct Consequence" of the Defendant's Breach Itself*

■ Under general contract principles, when one party breaches a contract the other party ordinarily is entitled to damages sufficient to make that

party "whole," that is, enough to place the nonbreaching party in the same position as if the breach had not occurred. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 813; Rest.2d Contracts, ¶ 347.) This includes future profits the breach prevented the nonbreaching party from earning at least to the extent those future profits can be estimated with reasonable certainty. (See, e.g., *Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 907-908 [215 Cal.Rptr. 679, 701 P.2d 826]; *Coughlin* v. *Blair* (1953) 41 Cal.2d 587 [262 P.2d 305]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 823.)

■ The trial court ruled that under these general contract principles PIP was entitled to estimated future royalties this franchisor would have earned in the coming year. This period extended from the time its franchisee, the Sealys, breached the franchise contract by failing to timely make certain royalty payments until the end of the term of this contract, a duration of almost eight years. We disagree. In so ruling, the trial court overlooked an important limitation embedded in the general rule.

■ Under contract principles, the nonbreaching party is entitled to recover only those damages, including lost future profits, which are "proximately caused" by the specific breach. (See, e.g., *Metzenbaum* v. *R.O.S. Associates* (1986) 188 Cal.App.3d 202, 211 [232 Cal.Rptr. 741]; *Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 457 [277 Cal.Rptr. 40] ["lost profits must be the natural and direct consequence of the breach"]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 814 ["It essential to establish a causal connection between the breach and the damages sought."].) Or, to put it another way, the breaching party is only liable to place the nonbreaching party in the same position as if the specific breach had not occurred. Or, to phrase it still a third way, the breaching party is only responsible to give the nonbreaching party the benefit of the bargain to the extent the specific breach deprived that party of its bargain.

In the context of franchisor-franchisee relationships, this principle is illustrated by cases from other jurisdictions awarding parties future profits when the breach itself prevented the party from earning those profits. In most of these cases it is the franchisor who breached and the franchisee who is collecting damages. For example, if the franchisor wrongfully terminates the franchise, courts have held the franchisee entitled to the future profits it would have earned had the franchise remained in effect. (*Martin Motor Sales* v. *Saab-Scania of America, Inc.* (S.D.N.Y. 1978) 452 F.Supp. 1047, affd. (2d Cir. 1979) 595 F.2d 1209.) Similarly, if the franchisor fails to provide clear title to its trademark so the franchisee cannot sell the franchised product or

service, courts have held the franchisee is entitled to the profits it would have earned on sales of that product or service during the term of the franchise agreement. (*A to Z Rental, Inc.* v. *Wilson* (10th Cir. 1969) 413 F.2d 899, 909.) Once again, if the franchisor wrongfully terminates a product line, courts have awarded the franchisee the future profits it would have earned on sales of the discontinued product. (*Buono Sales, Inc.* v. *Chrysler Motors Corporation* (3d Cir. 1971) 449 F.2d 715.)

In the above cases, it is easy to determine the lost profits were a "natural and direct consequence of the breach." Because the franchisor in these cases committed breaches which directly prevented the franchisee from earning the profits it reasonably could have expected to have earned under the contract, the franchisee is entitled to those lost profits as damages. (See also *MacLean & Assoc.* v. *Amer. Guar. Life Ins.* (1987) 85 Or.App. 284 [736 P.2d 586, 594].) Notably, however, at least one appellate court refused to award lost future profits in a franchise context because it deemed such damages too speculative. (*Chmieleski* v. *City Products Corp.* (Mo.Ct.App. 1983) 660 S.W.2d 275, 298; see also fn. 4, *post.*)

■■■  As mentioned earlier, we have found no cases in any jurisdiction, however, holding "lost future profit" damages for the type of breach involved in the instant case. Here the franchisee breached the franchise contract by failing to timely make some past royalty payments.[2] There is a "natural and direct" causal connection between the franchisee's breaches and the loss of those past royalty payments. As a direct result of these breaches the franchisor lost those past royalty payments. To be made "whole" or in the other terminology, to gain the "benefit of its bargain" the franchisor must receive those past, unpaid royalty payments.

But the franchisee's failure to timely make these past royalty payments is not a "natural and direct" cause of the franchisor's failure to receive future royalty payments. Indeed the franchisor could have remained entitled to those future royalties for the full term of the franchise contract even if it sued to collect the past payments. Nothing in the franchisee's failure to pay

---

[2]At oral argument, respondent contended the trial court based its award on a finding the Sealys themselves had repudiated or canceled the franchise agreement. The record on appeal does not support this characterization of the court's findings, however. The trial court's statement of decision does not include a finding of a contract repudiation on the part of the Sealys. Indeed the statement of decision does not even contain the term "repudiation." Instead the court bases its decision and damage award on a finding the Sealys committed a "material breach" of the agreement by failing to pay some of the royalties due under the contract. The statement of decision specifically finds it was the franchisor rather than the franchisee who terminated the franchise agreement. For this reason, we need not consider whether a franchisor would be entitled to "lost future profits" damages if the franchisee rather than the franchisor unilaterally canceled the franchise agreement.

past royalties in any sense prevented the franchisor from earning and receiving its future royalty payments. No, it was the franchisor's own decision to terminate the franchise agreement that deprived it of its entitlement to those future royalty payments. At worst, if the franchisor had not terminated the franchise agreement it might have been required to sue again or perhaps again and again to compel the franchisee to pay those future royalties in a timely fashion as those royalties accrued. (However, given the strong lesson the Sealys would have learned in having to pay PIP's attorney fees as well as interest and costs, it seems highly unlikely they would have ever again been late in making their royalty payments after losing this, the first collection action brought against them.)[3]

PIP points to several California cases in which courts have awarded lost future profits in other contexts. But in none of these was the defendant's breach a mere failure to pay moneys owed for past performance. Instead they involved total failures to perform at all.

For example, *in Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service, Inc.* (1932) 217 Cal. 131 [17 P.2d 712], the defendant contracted to promote a cleaning service and subcontract exclusively with plaintiff for a 10-year period, then stopped performing at all after a short time. The breach was total and akin to those involved in the franchise cases discussed above

---

[3]At oral argument, PIP's counsel argued the franchisor did not have the option of retaining the Sealys as franchisees and suing them in the future should they fail to make subsequent royalty payments. In his argument, counsel appeared to imply once it filed this action to recover these particular unpaid past royalty payments "basic contract principles" would prohibit PIP from filing suit to recover later unpaid royalty payments owed under the same contract.

Our research suggests the contrary proposition is well settled in contract law. (See, e.g., *Keck* v. *Bieber* (1892) 148 Pa. 645 [24 A. 170, 171] [Upon the nonpayment of royalties, "the plaintiff may sue *from time to time* for the royalties due . . . ."], italics added; (*Watson* v. *Berman* (1939) 302 Mass. 305 [19 N.E.2d 43, 44] [Where a note is payable in monthly installments, the plaintiff is not limited to a single action but may sue for successive monthly breaches in payment.]; cited in 6 Williston on Contracts (3d ed. 1962) § 862.) See also 1 Witkin, Summary of Cal. Law, *supra*, Contracts, §§ 795, 797, 800-801.)

The franchise agreement in this case establishes an executory contract. The franchisee receives a benefit each month—use of the franchisor's trademark and services—and pays for that benefit each month. When the franchisee fails to pay for one month's benefit the franchisor can sue to recover the unpaid payment for that month without losing its right to provide future benefits and sue again should the franchisee once again fail to pay for those later benefits. Even " '[w]here one party to an executory contract repudiates it and refuses any longer to be bound by it, the injured party has the right to elect to . . . keep the contract alive for the benefit of both parties, being and keeping himself at all times ready, willing, and able to perform his part of the contract, and at the time fixed by the contract for performance, sue and recover according to the terms of the contract. . . .' " (*Armstrong* v. *Illinois Bankers Life Ass'n* (1940) 217 Ind. 601 [29 N.E.2d 415, 421, 131 A.L.R. 769]; 5 Williston on Contracts, *supra*, § 695.)

where the franchisor wrongfully terminates the franchise or closes down a product line. So it is not surprising the California Supreme Court allowed the plaintiff to recover future profits it was prevented from earning as a direct result of defendant's breach.

Another case PIP cites follows a similar scenario. *In Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19 [142 P.2d 22], a lessor granted a lessee the right to extract minerals from a tract of land in return for a royalty based on the minerals extracted. Shortly thereafter, the lessor denied the lessee's request to assign the lease. The lessee then repudiated the lease and refused to perform. The California Supreme Court allowed the plaintiff lessor to recover its lost future profits, in this case the royalty payments it would have earned on the extracted minerals had the lessee performed. But once again the defendant's breach was a total failure to perform under the contract which directly prevented the plaintiff from earning those royalty payments. The lessee's breach in *Gold Min.* was not his failure to make one or more of the periodic royalty payments he would have owed the lessor if he had performed his contractual duty to extract minerals. Instead his breach was his failure to perform his duty to extract the minerals in the first place. So once again this case is no authority for awarding future lost profits as a penalty for failing to timely pay past profits.

Not only is this a case of first impression, but it is difficult to locate close analogies.[4] However, a franchise bears many similarities to a license and the relationship between franchisor and franchisee is similar to that of licensor and licensee. So it is instructive to find a California court held a nonbreaching party's decision to terminate a license because of the other party's breach also terminated the licensee's duty to pay future royalties under the license. (*Fageol & Tate* v *Baird-Bailhache Co.* (1931) 138 Cal.App. 1 [5 P.2d 75].) In that case, the court held: "The provision for the termination of the contract

---

[4]Although the cases are distinguishable on the facts, we observe two other courts expressed reluctance to award future royalties to franchisors once their franchisees lost the trademark and other benefits to which they had been entitled under the franchise agreement. In *In re Arthur Treacher's Franchises Litigation* (3d Cir. 1982) 689 F.2d. 1137, a franchisor terminated a franchise and then sued to enjoin a franchisee from continued use of the trademark. By the time the case reached the appellate state the franchisee had agreed to give up the trademark and other franchise benefits. The Third Circuit then held, "Since [defendant] is no longer an Arthur Treacher's franchisee using Arthur Treacher's trademark, it should no longer be required to pay royalties." (*Id.* at p. 1143.)

Likewise, in Brennan v. Carvel Corp., Business Franchise Guide (CCH) paragraph 9446, page 20,316 (Bankr. D.Mass. 1994) a franchisor terminated the franchise of a failing franchisee. The case differs from the Sealys' situation because the court also found the franchisor had breached an agreement to select an appropriate site. Nonetheless, the opinion expresses a broader principle. "When [the franchisee] ceased to be a Carvel franchisee and stopped using Carvel trademarks, they were no longer required to pay royalties to Carvel Corporation." (*Id.* at p. 20,327.)

upon default of the licensee was for the benefit of the licensors. Upon default of the licensee[,] the licensors could either terminate the contract by giving the thirty-day notice therein provided for or they could elect to continue the contract in force and insist on the payment of the royalties as they accrued. They could not do both. . . . The license of the appellant to manufacture and sell the patented articles ceased . . . and their obligation to pay future royalties ceased as well." (138 Cal.App. at p. 4.) Likewise in the instant case, once PIP terminated the franchise agreement the right of the Sealys to sell their printing services as a PIP franchise ceased, and so it would seem "their obligation to pay future royalties ceased as well."

We conclude the Sealys' breach in failing to timely pay *past* royalties and advertising fees was not a "proximate" or "natural and direct" cause of PIP's loss of *future* royalties and advertising fees. Failing to make those payments did not prevent PIP from receiving royalties on future revenues the Sealys' produced under the franchise agreement. It was only when PIP elected to terminate that agreement that it ended the Sealys' ability to produce revenues as a PIP franchisee and also ended its own right to collect royalties on those revenues. Accordingly, these future profits are not a form of damages to which PIP is entitled for this particular breach of the franchise agreement. At the same time, we wish to make it clear we are not holding franchisors can never collect lost future royalties for franchisees' breaches of the franchise agreement. That entitlement depends on the nature of the breach and whether the breach itself prevents the franchisor from earning those future royalties.

III.    *Even if Appellants' Breach Was the Cause of PIP's Losing Some Future Royalty Payments, It Is Inappropriate to Award Lost Future Profits Where It Would Result in Damages Which Are Unreasonable, Unconscionable and Oppressive*

■    As a second independent and sufficient rationale[5] for our reversal of the trial court's "lost future profits" award, we conclude it would violate the

---

[5]Because we reverse the "future lost profits" award on the two grounds discussed in this opinion, we need not consider whether this award also runs afoul of a third limitation on such awards. The law allows the award of lost future profits only when courts can calculate their amount with some degree of certainty.

In the present case, the trial court found that degree of certainty in a straightforward projection of past experience to the seven and a half years remaining on the franchise contract. The court based this projection on the Sealys' gross income for the 1990-1991 period. It multiplied this gross by the royalty fee of 6 percent and the advertising fee of 1 percent to arrive at an annual lost royalty figure. The court then multiplied that annual lost royalty amount by the number of years remaining on the franchise contract.

At first blush, the very simplicity of this calculation appears to support a finding it is possible to estimate "lost future profits" in this case with the requisite certainty. But upon

statutory and common law prohibition of damages which are "unreasonable, unconscionable or grossly oppressive."

This prohibition is found in Civil Code section 3359. "Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to

---

closer examination this simple formula may be an oversimplification. In order to estimate what PIP stands to lose in the form of lost future profits after it terminated the Sealys' franchise requires a court to consider a complex equation of imponderables. It takes a great deal of courage if not daring to venture a guess as to the gross profits a PIP outlet is likely to earn seven—or five or even three—years hence in a field as volatile as printing and reproduction. By the time this franchise term runs out "desktop publishing," the "information superhighway," the "paperless office," and like developments already may have transformed the industry in which the PIP stores and like operations strive to operate. This case arises in a field where the short-term future, to say nothing of the medium- and long-term future, is almost uniquely unpredictable.

But the major imponderable in estimating how much net profit PIP will lose over the next seven years resulted from PIP's election to terminate the franchise agreement and thus to release PIP to open a new outlet directly across the street from the Sealys' print store. Or it could open a "mega-store" a few blocks away with advanced equipment and services which drew customers from a broad territory including the Sealy print store. In either event, the Sealys could lose most or all of their business—and gross revenues—to another PIP franchise or two. Meanwhile PIP would be receiving royalty payments from its new franchisees on the business which used to go to the Sealys but now went to the competing PIP outlets. To the extent it received these royalty payments PIP would not experience net "lost profits" from the Sealys' departure from the PIP fold. Conversely, to the extent PIP already had received a "lost profits" damage award from the Sealys, the corporation would receive *double* profits on the income its new franchisee managed to attract from the Sealys.

Whether and when PIP chooses to award a franchise to open a store or mega-store which will compete with the Sealys' establishment is almost entirely in PIP's control. The franchisor is free to do so from the moment it cancels the agreement. It has little incentive to install a new franchise, however, until it has won its award of "future lost profits" from the disenfranchised franchisee, *assuming the courts allow such an award*. Once the franchisor has that award in its pocket, it has nothing to lose from vigorously seeking out someone interested in opening a franchise store right next door to its former franchisee. Any dollar that new franchisee turns over to the franchisor in the form of a royalty payment is a dollar of *extra* profit for that franchisor, since it already has received its expected royalty payments for that franchise territory in the form of a "lost future profits" award from the court.

It follows that a franchisor, such as PIP, would have every reason to wait until after it received the "lost future profits" award before doing anything which someone might construe as an attempt to install a competitor to its former franchisee. For, if it does so before trial the franchisor would risk losing its "future lost profits" damages. So it is hardly surprising the Sealys failed to introduce evidence PIP had awarded a competing franchise or was about to or even had done anything suggesting it might be considering that option. Moreover, short of finding and tendering its own competition, the Sealys had no way of mitigating the "lost future profits" damages they might be inflicting on PIP.

This court recognizes these difficulties in arriving at an estimate of *net* "lost future royalties" in which we can have any confidence. However, we need not and do not address the issue whether the extreme instability of the print shop market and especially the franchisor's absolute control over the "competing franchisee" variable combine to render any estimate of *net* future lost royalties so speculative as to preclude an award of such damages.

substantial justice, no more than reasonable damages can be recovered." The limitation applies to contract as well as tort damages. (*People* v. *Southern California Edison Co.* (1976) 56 Cal.App.3d 593 [128 Cal.Rptr. 697].) The Restatement contains a similar limitation which applies specifically to contract damages. This one recognizes the potential of "future lost profit" awards in particular to produce excessive compensation for the plaintiff. "A court may limit damages for foreseeable loss *by excluding recovery for loss of profits*, . . . if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." (Rest.2d Contracts, ¶ 351(3), italics added.)

In our view, PIP's entitlement to recover its past unpaid royalties, along with attorney fees and costs, along with its right to immediately install a new franchisee in what formerly had been the Sealys' exclusive territory provides it with a full measure of "reasonable" damages. But a further award of "lost future royalties" provides PIP with "disproportionate compensation" which is "unreasonable" and an "unconscionable" and "grossly oppressive" imposition on its franchisee, the Sealys. To do so is "contrary to substantial justice" between franchisors and franchisees in general and this franchisor and this franchisee in particular. Damages of this nature and in this amount distort the relationship between the breach and its remedy and seriously disturb the balance between franchisor and franchisee and between creditor and debtor. In essence, allowing "lost future profits" damages in these circumstances would place a bludgeon in the hands of franchisors in contract disputes with their franchisees.

The relationship between franchisor and franchisee is a significant issue, and growing more important each year. As recently explained, "Franchising is rapidly becoming the dominant mode of distributing goods and services in the United States. According to the International Franchise Association, one out of every twelve businesses in the United States is a franchise. In addition, franchise systems now employ over eight million people and account for approximately forty-one percent of retail sales in the United States. Even conservative estimates predict that franchised businesses will be responsible for over fifty percent of retail sales by the year 2000."[6] (Hess, *The Iowa Franchise Act: Towards Protecting Reasonable Expectations of Franchisees and Franchisors* (1995) 80 Iowa L.Rev. 333, fns. omitted)

Although franchise agreements are commercial contracts they exhibit many of the attributes of consumer contracts. The relationship between

---

[6]The "conservative estimates" came during congressional hearings held in 1990. (House Com. on Small Business, 101st Cong., 2d Sess., Franchising in the U.S. Economy: Prospects and Problems (Com. Print) at p. 16.)

franchisor and franchisee is characterized by a prevailing, although not universal, inequality of economic resources between the contracting parties. Franchisees typically, but not always, are small businessmen or business-women or people˙ like the Sealys seeking to make the transition from being wage earners and for whom the franchise is their very first business. Franchisors typically, but not always, are large corporations. The agreements themselves tend to reflect this gross bargaining disparity. Usually they are form contracts the franchisor prepared and offered to franchisees on a take-or-leave-it basis. (Emerson, *Franchising and the Collective Rights of Franchisees* (1990) 43 Vand. L. Rev. 1503, 1509 & fn. 21.) Among other typical terms, these agreements often allow the franchisor to terminate the agreement or refuse to renew for virtually any reason, including the desire to give a franchisor-owned outlet the prime territory the franchisee presently occupies.[7]

Some courts and commentators have stressed the bargaining disparity between franchisors and franchisees is so great[8] that franchise agreements exhibit many of the attributes of an adhesion contract and some of the terms of those contracts may be unconscionable. "Franchising involves the unequal bargaining power of franchisors and franchisees and therefore carries within itself the seeds of abuse. Before the relationship is established, abuse is threatened by the franchisor's use of contracts of adhesion presented on a take-it-or-leave-it basis. (See, e.g., *Ungar* [v. *Dunkin' Donuts of America, Inc.* (3d Cir. 1976) 531 F.2d 1211], 1222-1223; *Semmes Motors, Inc.* v. *Ford Motor* (2d Cir. 1970) 429 F.2d 1197, 1207; see generally, Note, *Fairness in Franchising: The Need for a Good Cause Termination Requirement in California* (1980) 13 U.C. Davis L.Rev. 780, 785, fn. 18. . . .) Indeed such contracts are sometimes so one-sided, with all the obligations on the franchisee and none on the franchisor, as not to be legally enforceable. (Brown & Cohen, *Franchising: Constitutional Considerations for 'Good Cause' State*

---

[7]Sometimes legislators and courts have interfered with the franchisors' ability to enforce these contract terms against franchisees. (See, e.g., *Kealey Pharmacy* v. *Walgreen Co.* (7th Cir. 1985) 761 F.2d 345 [Wisconsin franchise statutes prevented franchisor from enforcing contract provision terminating 13 franchisees for "inadequate sales" in order to replace with company-owned stores].) Nonetheless, we find it significant the franchisors were able to induce their franchisees to agree to such draconian provisions.

[8]A comment PIP's counsel made at oral argument underscores this franchisee's lack of bargaining power. The court asked why any prospective franchisee would sign an agreement with PIP if the contract were construed to give PIP up to 20 years of "lost future profits" for a failure to timely make a royalty payment or for a similar "material breach." PIP's counsel responded there were lots of people earning $6 an hour in the labor force who would welcome the opportunity to sign such an agreement in order to gain the chance for the much higher earnings available to successful PIP franchisees. (This evidently was a reference to the Sealys, since there are indications in the record Mr. Sealy was working for $6 an hour prior to becoming a PIP franchisee.)

*Legislation* (1978) 16 Hous.L.Rev. 21, 33. . . .)." (*E. S. Bills, Inc.* v. *Tzucanow* (1985) 38 Cal.3d 824, 835-836 [215 Cal.Rptr. 278, 700 P.2d 1280] (conc. opn. of Mosk, J.).)

The "lost future profits" award PIP seeks in this case dramatically expands the already enormous bargaining gap between this franchisor and this franchisee. PIP argues it is entitled to these damages because the failure to timely make one or more royalty payments constitutes a "material breach" under the contract. The franchise agreement further provides any "material breach," in turn, entitles the franchisor to terminate the contract and collect the "benefit of the bargain," which in PIP's view means all the future royalty fees the franchisor could expect to receive from this franchisee for the remaining term of the contract. Thus, under PIP's view, had the Sealys failed to timely make their first royalty payment PIP would have been entitled to declare a breach, terminate the franchise agreement and collect 20 years of estimated future royalty payments from the newly disenfranchised franchisees, the Sealys.[9]

For reasons explained in section II, we do not construe the franchise agreement as permitting this form of damages as part of the franchisor's "benefit of the bargain" when it elects to terminate the franchise because a franchisee failed to timely make some past royalty payments. As pointed out in this earlier section, in the context of a franchise arrangement "future lost profits" are not a result of the franchisee's breach in failing to timely pay royalties but of the franchisor's election to cancel the franchise agreement. Consequently, the receipt of "lost future royalty payments" is not part of the bargain to which the franchise agreement entitles the franchisor when it terminates for this type of breach.

But even assuming this contract is properly construed to call for an award of "lost future royalty payments" after PIP terminated the Sealys' franchise for nonpayment of past royalties, we conclude such an award would be "excessive" and "unconscionable" and "oppressive" within the meaning of Civil Code section 3359. Furthermore, it would provide PIP with "disproportionate compensation" within the meaning of Restatement Second of Contracts section 351, subdivision (3).

---

[9]The terms of this franchise agreement, if fully enforced, would have been even more draconian. As noted earlier, the agreement contained a "no compete" clause which precluded the Sealys from continuing in the print shop business. Were that term enforced along with the "lost future royalties" award, the Sealys would have been required to pay a judgment calculated as a percentage of the gross receipts they no longer were allowed to earn, even if they did so without the PIP trademark or other franchise benefits. Meanwhile PIP would have been able to install a new franchisee, perhaps in the Sealys' abandoned location, and receive a second royalty on the same business which formerly would have gone to the Sealys but now was coming to its new franchisee.

To sanction such an award in this case would so unbalance the relationship between franchisors and franchisees as to threaten to convert every franchise agreement allowing such damages into an unconscionable and oppressive contract. Imagine the position of a small-business person operating a franchise involved in some minor contract dispute with the franchisor during the 20-year term of the agreement. The franchisee fails to do everything exactly the way the franchisor demands and the franchisee risks declaration of a "material breach" backed up by the whip of a giant "lost future profits" award. Such an award would leave the franchisee enslaved for 5 or 10 or 20 years working primarily for the franchisor's benefit but without its trademark or other services. Franchisors would seldom have to apply that whip, of course. It would be enough to crack it now and then to keep their franchisees in line. This is nearly the definition of oppression. And, a specie of damage award which produces this degree of imbalance between a franchisor and his franchisees is clearly "oppressive" as well as "excessive."

For this second independent and sufficient reason, we also are compelled to reverse the trial court's award of "lost future profits" damages (in this case future royalty and advertising fee payments.)

## CONCLUSION

Although we find compelling reasons for reversing the "lost future profits" award in this case, we emphasize the limits of our holding. We are not holding a trial court can never appropriately award *some* "lost future profits" to a franchisor. In a future case, the breach may be of a type which directly causes the franchisor to lose future profits independent of the franchisor's own termination of the franchise agreement. Furthermore, the amount of the award may be of a size which is neither "excessive" nor "oppressive" nor "disproportionate to the loss." What we do hold, however, is that a "lost future profits" award to a franchisor must satisfy all of these conditions— just as would such an award to any other party. Furthermore, we conclude the franchisor-franchisee relationship introduces some special considerations in determining whether the conditions are met. As detailed above, those considerations include the lengthy term of such agreements, the franchisor's power to terminate the franchise and substitute a new franchisee, and the typical imbalance between the parties.[10]

---

[10]We also stress we do not adopt a position the Sealys' counsel advocated at oral argument. He pressed for a rule which would allow franchisees to terminate the franchise agreement almost at will subject only to forfeiture of the "security deposit" and payment of past unpaid royalties, if any.

The Sealys' counsel justified this as a market-oriented solution. He argued franchisees would only give up their rights to the franchise trademark and other services when those

DISPOSITION

The judgment is reversed insofar as it awards expectancy damages in the form of estimated future lost profits (franchise royalty and advertising fee payments) and the cause remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. Appellants to recover their costs on appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied April 17, 1996, and respondent's petition for review by the Supreme Court was denied July 24, 1996.

---

"benefits" no longer were worth the franchise fee because it had become a "dying" franchise system. (He further claimed PIP is such a "dying" system, because of changes in technology and market conditions.) In his view, it is unfair and uneconomic to force franchisees to remain linked to a sinking franchisor by requiring them to continue paying royalty fees if they elect to terminate the franchise agreement. It is better for the economy to permit strong franchisees to swim away on their own to operate as independent businesses rather than sinking with the rest of the system. If required to continue paying royalties for unnecessary and possibly counterproductive trademarks and services, even the stronger franchisees may not be able to survive.

This is an interesting argument but one which we do not adopt in this opinion. For whatever reason, the Sealys' counsel argued for a principle far broader than needed to resolve the instant case. Here we have a franchise agreement the franchisor, not the franchisee elected to terminate, instead of maintaining the franchise and filing a debt collection action for unpaid royalties. The franchisor cited the franchisee's failure to timely make some past royalty payments as the "material breach" justifying this termination. Under these circumstances, it is unnecessary for this court to consider what "future lost profits" damages might be appropriate where a franchisee rather than the franchisor unilaterally terminates the agreement.