Steven **BROOKS,** Plaintiff–Appellant,

v.

**NETWORKS OF CHATTANOOGA, INC.,** d/b/a **Connecting Point Computer of Chattanooga, Robert Knowling and Frank Blair, III, Defendants–Appellees.**

Court of Appeals of Tennessee, Eastern Section.

Dec. 23, 1996.

Permission to Appeal Denied by Supreme Court May 5, 1997.

322

William H. Horton, Horton, Maddox & Anderson, P.L.L.C., Chattanooga, for Appellants Networks of Chattanooga, Inc., and Robert E. Knowling.

Flossie Weill, Weill & Weill, Chattanooga, for Steven Brooks.

## OPINION

McMURRAY, Judge.

This appeal involves the interpretation of a written lease agreement. The plaintiff-appellant, Steven Brooks, purchased a commercial building in Chattanooga in which Networks of Chattanooga operated a computer store known as Connecting Point Computer of Chattanooga. Networks and its president, Robert E. Knowling, were defendants in the case below and also raise issues on appeal.

The parties had been operating under a written lease, which expired on October 1, 1990. Networks was a holdover tenant until March 1991, when an addendum to the lease was signed. The lease agreement contained a holdover provision providing for double rent during any period of holdover. The addendum signed in March 1991 was for a one year lease period from January 1, 1991 to December 1, 1991, and contained a one year option. That option was exercised, so the time for expiration of the lease became December 1992. Networks did not sign a new lease in December 1992, although the parties discussed a new lease arrangement several times. From January to August 1993, Networks continued to operate its store as a holdover tenant. Networks continued to make its monthly payments in an amount equal to the regular rent payment due under the 1992 lease.

The parties had several discussions concerning a re-leasing of the original premises, re-leasing a smaller portion of the premises, or relocating to another facility owned by the plaintiff. In August 1993, however, Networks ceased operations and vacated the facility. The plaintiff thereafter sought payment of double rent for the holdover period. In December 1994, plaintiff filed suit to collect the double rent, and other monies allegedly due.

The trial court issued a memorandum opinion on December 7, 1995, holding the defendants liable for four months of double rent after termination of the original lease agreement. The court awarded attorneys' fees to the plaintiff in the amount of $5,000.00 plus 10 percent of the double rent for late charges and penalties. The court also awarded $691.36 for unpaid taxes and utilities.

Both parties have appealed, raising several issues. Plaintiff's issues are as follows:

1. The trial court erred in arbitrarily limiting the enforcement of defendants' contractual obligation under the holdover clause of the lease.

2. The trial court erred in relieving defendants from their contractual obligation for maintenance and repair expenses under the lease.

The defendants submit the following issues for our consideration:

1. Did the trial court err in holding defendants liable for four months of double rent pursuant to a clause in their lease with plaintiff allowing double rent during a holdover?

2. Did the trial court err in holding Robert Knowling personally liable under the lease, since he did not sign the original lease as an individual and the addendum did not incorporate the guaranty of the original lease?

3. Did the trial court err in awarding attorney's fees and a ten percent surcharge to plaintiff if defendants are found not liable for double rent under the lease?

We will first address the validity of the award of double rent. The holdover paragraph in the lease agreement provides as follows:

SECTION 9.6 *SURRENDER OF PREMISES AND HOLDING OVER.*

At the expiration of the tenancy hereby created, Tenant shall surrender the Leased Premises in the same condition as the Leased Premises were in upon delivery of possession thereof to Tenant, reasonable wear and tear excepted, and damage by unavoidable casualty excepted to the extent that the same is covered by Landlord's fire insurance policy.

Prior to the expiration or sooner termination of this lease Tenant shall remove any and all trade fixtures, equipment and other unattached items which Tenant may have installed or stored in the Leased Premises. Tenant shall repair any dam-

age to the Leased Premises caused by its removal of such fixtures and movable. Tenant shall not remove any plumbing or electrical fixtures or equipment, heating or air condition equipment, floor coverings (including but not limited to wall to wall carpeting), wall or ceilings, or anything else which may be deemed to constitute a part of the freehold and/or leased interest of Landlord, nor shall Tenant remove any fixtures or machinery that were furnished or paid for by Landlord (whether initially installed or replaced).

The failure or refusal to surrender the Leased Premises at the end of the term as set out herein, or any renewal or extension thereof, and the subsequent holdover shall result in a *tenancy at will at a monthly rental of double the amount payable by Tenant to Landlord for the last month of the term of this lease.* Tenant may be required to vacate the Leased Premises without further notice and be removed by legal process as upon a forcible and unlawful detainer. (Emphasis added).

The trial court found the above provisions to be clear and unambiguous. The court found that the provision's first paragraph mandates the surrender of the leased premises at the expiration of the tenancy, and that the second paragraph contemplates the preparation for surrendering of the premises to take place prior to the expiration of the lease. As to the third paragraph, the court found that the "very clear language" refers to the failure or refusal to surrender, and the subsequent holding over to result in a tenancy at will with a monthly rental of double the amount paid in the last month of the regular lease term.[1] The court, however, found that only four months' double rent was owed because the conduct of the plaintiff did not constitute fair dealing. Specifically, the court found that negotiating with the defendants for a new lease without enforcing the double rent provision was reasonable conduct

for four months, but continuing to accept rent and acquiesce in the current arrangement so long as negotiations continued, and the refusal to accept the rental proposal offered by a July 27, 1993 letter from defendants was not fair dealing. The court found that continuing that conduct "when the absolute right to enforce the vacating of the premises existed is acquiescence which precludes Mr. Brooks returning to the type of performance specified in the contract." The court also found the defendant, Robert Knowling, to be personally liable under the terms of the lease agreement. For the reasons set forth below, we affirm in part and reverse in part.

■■■ As to the validity of the double rent provision, an individual is free to bind himself by a contract whose terms may not seem reasonable or decent to an outside observer, and the court will not concern itself with the wisdom or folly of the contract. *See Chapman Drug Co. v. Chapman,* 207 Tenn. 502, 341 S.W.2d 392 (1960). Defendants argue that the double rent provision constitutes an unenforceable penalty. Defendants correctly contend that Tennessee law disfavors penalties, and an unreasonable damages provision, regardless of whether it was agreed to by the parties, will not be enforced. *See Beasley v. Horrell,* 864 S.W.2d 45, 48 (Tenn.App.1993). *See also Harmon v. Eggers,* 699 S.W.2d 159, 163 (Tenn.App.1985).

■■■ We believe, however, that the facts of this case are substantially different from the cases finding a damages provision unreasonable. In *Beasley,* the terms of a promissory note constituted an unenforceable penalty since they provided for the cancellation of the note if the holder failed to make any payment under leases executed in conjunction with the note. The court found in *Beasley* that the amount of actual damages was grossly disproportionate to the amount of the penalty, since the plaintiff could forfeit the

---

1. The court also found that the lease contained a requirement that demand of unpaid rent, including double rent, must be made within five days of failure to pay the rent due. The court found that the landlord's failure to make such timely demand was not a waiver, however, since the lease contained a non-waiver provision which precluded the "absence of demand argument" by the defendants.

We note, however, that demand is not a requirement under the lease as a prerequisite to collection of rent. The notice provision simply provides that the landlord may give notice and allow the tenant five days to cure a default.

entire amount of the note plus $40,000 in interest if they missed or were late one lease payment. *Beasley,* 864 S.W.2d at 48–49. In *Harmon,* the court found a "liquidated damages" clause tantamount to a forfeiture clause, in that the plaintiffs had paid in excess of 50 percent of the purchase price. *Harmon,* 699 S.W.2d at 164. Such is not the case here. The parties in this case were working under a month to month tenancy, which, the record reflects, was not considered by the landlord to be a beneficial arrangement. This is supported by the landlord's continued negotiations with the tenant for a longer-term lease. We do not believe, under the facts and circumstances of this case, that a provision calling for double rent during a holdover period was unreasonable. We note that the common law rule as set forth by the Supreme Court in *Brinkley v. Walcott,* 57 Tenn. 22 (1872), and followed by this court in *Russells Factory Stores, Inc. v. Fielden Furniture Co.,* 33 Tenn.App. 688, 232 S.W.2d 592 (1950) is still viable law in this jurisdiction. As stated in *Russells Factory Stores,* "[w]here a tenant receives reasonable notice of a change in rental, his continuance in possession beyond the rent period renders him liable for the new rent notwithstanding any protest he may make." (Citations omitted). It would seem to be enigmatic to allow the collection of increased rentals on reasonable notice and deny increased rents expressly contracted for in a written contract. Parenthetically, we should note that the Supreme Court in *AHCI, Inc. v. Lamar Adv. of Tenn., Inc.,* 898 S.W.2d 191 (Tenn.1995) reaffirmed *Brinkley* and *Russells.*

In summary, the rule as enunciated in *Brinkley* and *Russells* continues to be the law in Tennessee in situations where the landlord gives a reasonable notice of the rent increase in the form of a definite demand. Where there is no agreement between the parties, the tenant becomes liable for the fair market rental value for the period that it occupies the premises beyond the term of the lease.

*AHCI,* at page 195.

In *AHCI,* however, the court denied increased rentals claimed by the lessor on the grounds that there had been no firm demand for increased rentals but only a negotiable offer. The lessor was limited to recovery of the fair market rental value of the premises. *AHCI* is distinguishable from this case, however, since here, we have a written agreement as to the amount of the holdover rental. The written agreement constitutes reasonable notice to the tenant that additional rents and the amount thereof will become due and payable on any period of holdover.

The defendants also argue that they were not holdover tenants because they did not remain on the premises against the landlord's will. The holdover provision of the lease applied to a tenant's "failure or refusal to vacate." Defendants argue that the plain language of the term failure is defined as the "nonperformance of what is requested." Defendants presented this definition at trial from the American Heritage Dictionary. The defendants, however, omitted the remainder of the definition. We quote the definition from the American Heritage Dictionary, Third Edition: "Nonperformance of what is requested *or expected.*" (Emphasis added). Obviously, when the definition is read in its totality, it becomes clear that the defendants did fail to vacate the premises. The holdover provision, which we emphasize was found to be clear and unambiguous, states that the tenant "*shall* surrender the Leased Premises" at the expiration of the lease. (Emphasis added). Clearly, by the terms of this provision, the tenant was expected to surrender the premises when the lease expired. Therefore, according to the terms of the holdover provision, remaining on the premises without immediately executing a new lease constituted a failure to surrender the premises and the holdover provision was triggered. We also note that to be a holdover the tenant does not have to hold against the will of the landlord. Here, a holdover was expressly created by the terms of the lease agreement. We agree with the trial court that the defendants were holdover tenants.

We now turn to the trial court's decision that the plaintiffs were liable for four months of double rent only. The court found that the plaintiff was guilty of unfair dealing and

allowed a recovery of only four months of double rent despite the fact that the defendants remained on the premises for eight months. Defendants take the position that the award of four months double rent was error.

■ The lease agreement contained a non-waiver proviso which is as follows:

*Non–Waiver Provisions.* The failure of Landlord to insist on a strict performance of any of the terms, conditions and covenants herein shall not be deemed to be a waiver of any subsequent breach or default in the terms, conditions and covenants herein contained except as may be expressly waived in writing.

Applying the clear provisions of the non-waiver agreement to this case, the fact that plaintiff accepted the monthly rental checks and did not indicate that he intended to collect the double rent until June 1993 does not constitute a waiver of any rights of the landlord under the contract absent a written agreement to the contrary. The purpose of such a provision is to prevent the result the defendants seek to obtain. The argument that plaintiff did not collect double rent during previous holdovers and constitutes unfair dealing must fail. This issue falls squarely within the non-waiver provision. Additionally, the previous holdover periods resulted in the defendants re-leasing the property. This holdover period did not. Plaintiff's failure to insist that double rents be paid during the previous holdover periods inured to the benefit of the defendants. Plaintiff testified that he felt it unfair to require the double rent for the previous periods if the tenant executed a new lease, and that he made that same offer to defendants during this period.[2] We are not unmindful of the case of *Heritage Federal Savings & Loan Association v. Begley Drug Co.,* 1992 WL 221007, an unreported opinion of this court filed at Jackson, September 15, 1992. We think, however, that *Heritage Federal* has no application to the facts in dispute in this case. Were the landlord attempting to collect double rents for the previous periods between the expiration

of the lease and a new agreement, the result might be otherwise.

■ It is well-settled that every contract contains an implied duty of good faith and fair dealing in its performance and enforcement. *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn.App.1987) and *Hurley v. Tennessee Farmers Mutual Ins. Co.,* 922 S.W.2d 887 (Tenn.App.1995). In support of the proposition that the plaintiff was guilty of unfair dealing, the defendants put forth the same argument, *i.e.,* that the plaintiff should be estopped from collecting the double rent because of his actions in failing to collect double rent for the previous holdovers.

We are of the opinion that the continuation of negotiations and continued acceptance of rent until all negotiations failed does not constitute either estoppel or unfair dealing. On the contrary, the defendants are chargeable with knowledge of the holdover provisions of the lease. We are of the opinion that the record does not support a finding that the plaintiff was guilty of unfair dealing.

The defendants concede in their brief that Mr. Brooks should be awarded either the entire amount of the double rent for the holdover period or none at all. We quote from defendants' brief: "Nothing in Mr. Brooks' conduct indicates that he should be estopped from collecting double rent for some months and not others." We agree with the defendants on this point. Therefore, in light of our determination that the plaintiff was not guilty of unfair dealing, we must conclude that the plaintiff is entitled to double rents for the entire eight month period in question. Having reached that conclusion, we find no valid reason for the trial court to limit the award to four months of double rent. We find that the judgment of the trial court must be modified so as to award the plaintiff double rent for the entire holdover period of eight months.

Our resolution of this issue pretermits the issue relating to attorney fees and the surcharge since the premise upon which the

---

**2.** Plaintiff seeks to recover double rent for the period from the expiration of the last lease exten-

sion until the defendants vacated the premises.

issue was based was that there was no liability for the double rent.

The next issue we address is whether the trial court erred in holding Robert Knowling personally liable on the lease. Defendants argue that the language of the lease and addendum do not show that Mr. Knowling intended to personally guarantee the lease, and, alternatively, that the guaranty clause was not within the circle of assent of Mr. Knowling. In asserting this position, the defendants argue that *In re Estate of Dickerson*, 600 S.W.2d 714 (Tenn.1980) is controlling. In *Dickerson*, a lease agreement was executed purporting to be between a limited partnership as landlord and a corporation and its president as tenants. No other parties were named in the body of the lease. The lease was signed on behalf of the limited partnership by the general partner. The president of the corporation signed on behalf of the corporation. The lease agreement also contained a signature line and the signature of Dickerson, whose estate was under probate. The landlord brought an action against the estate of Dickerson to recover monies alleged to be due under the terms of the lease. The probate court held that Dickerson was personally liable. The Supreme Court reversed the judgment of the probate court. In so doing, the Supreme Court citing many authorities reaffirmed the following rule:

> It is a general rule of interpretation of contracts that when the body of a contract purports to set out the names of the parties thereto and a person not named in the body of the contract signs the contract and nothing in the contract indicates that such person signed as a party, then such person is not bound as a party to the contract and is not liable thereunder.

Applying the rule to the facts in *Dickerson*, the court specifically found that Dickerson did not incur liability as a principal party to the lease contract. The court then considered whether the signature created personal liability on Dickerson's part as a guarantor. The court determined that since the lease did not contain any promise by Dickerson to answer for the debt, default or miscarriage of the tenant named therein, the lease did not constitute a compliance with the Statute of Frauds. The court, therefore, concluded that Dickerson was not liable as a guarantor.

We are faced with a strikingly similar situation here. The body of the lease agreement as amended by the addendum which Mr. Knowling signed as president and individually does not purport in any way to make Mr. Knowling a party to the contract. As in *Dickerson*, the lease agreement does not contain any promise by Mr. Knowling to answer for the debt, default or miscarriage of the tenant named therein. On the contrary the lease agreement contains a specific guaranty provision which clearly indicates that Mr. Knowling was not a guarantor on the agreement. The guaranty paragraph in the lease agreement provides as follows:

> 9.12 *Tenant's Shareholder.* The sole shareholder of the Tenant (hereinafter referred to as "Shareholder") is joining in the execution of this lease agreement, in consideration of financial accommodations afforded or from time to time to be afforded to Tenant by Landlord. The Shareholder, hereby guarantees the full and prompt payment and performance by Tenant of all its duties and obligations under this lease. This guaranty shall be continuing, absolute and unconditional, and shall apply to and cover all of the obligations of the Tenant under this Lease Agreement, and shall remain in full force and effect during the Term of this lease and any renewals or extensions thereof.

Both the lease agreement and the addendum (which plaintiff argues establishes the liability of Mr. Knowling) were signed by Frank Blair as Shareholder. There is nothing to indicate that any of the parties intended Mr. Knowling to be a guarantor. Applying the rule enunciated in *Dickerson* to the facts of this case, Mr. Knowling is not personally a party to the lease agreement and the Statute of Frauds, as applied in *Dickerson* precludes liability on the part of Mr. Knowling as a guarantor. The use of the word individually after the signature of Mr. Knowling does not change the result. We, therefore reverse and vacate the judgment of the trial court finding Mr. Knowling to be personally liable.

Plaintiff argues that the trial court erred by relieving the defendants from their contractual obligation for maintenance and repair expenses under the express provisions of the lease. The court found that the installation of awnings, painting, sealing the parking lot and the installation of lights were capital improvements for which the tenant was not liable under the lease. Plaintiff argues that the lease was a "triple net lease," which provided that the lessee must pay its share of the operating cost of maintaining the common areas and building, as well as all repairs and maintenance. Plaintiff presented evidence that the painting of the exterior of the building was maintenance. Plaintiff further claims that the sealing of the parking lot "amounts to little more than painting," and as such was a repair to a common area. Furthermore, the installation of the lights was done by the Electric Power Board of Chattanooga, for which no capital expense was required. Rather, plaintiff received a monthly service bill for the lights, and was thus part of the utility service for which the tenant was responsible. As to the awnings, plaintiff claims that the awnings were not capital improvements since they were replacements for existing awnings that had become worn.

The defendants seek to characterize these items as capital improvements based on the testimony of an accountant as to how the expenditures would be handled for tax purposes. Ms. Tamra Murr, a certified public accountant testified as follows:

> Normally the expenditure—you have to determine whether the expenditure will add a more useful life to the building on major improvements.

> An on repairs, they're normally expensed (sic) if they are something that is general maintenance that may have to have actually repaired something, but considering a major—you know a capital improvement, if it adds to the physical life of the building are expensed (sic).

Ms. Murr further testified that the items for which payments are sought by the plaintiff were capital improvements. We do not find the explanation of Ms. Murr to be persuasive. Common sense dictates that maintenance, such as painting the structure and resealing the parking lot adds to the physical life of the building, yet without question these activities are no more than ordinary maintenance. We are further of the opinion that replacement of damaged awnings as opposed to the installation of new awnings falls within the purview of maintenance. Such activities are nothing more than expenditures which are required to keep the building in a state of good repair. In sum and substance, we believe that the expenditures for which the plaintiff claims pro rata reimbursement are purely maintenance.

We, therefore, agree with plaintiff that these items were not capital improvements, but were in fact maintenance and repairs, and thus should have been paid pro rata by the tenant, as contemplated in section 1.3(b) and 2.3 of the Lease Addendum.[3] We are further of the opinion that the expenses claimed fall clearly within the purview of paragraph 2.3 of the Lease Addendum which provides in pertinent part as follows:

2.3 *Common area and Other Charges.*

\* \* \* \* \* \*

Landlord shall maintain the common areas in good order, condition and repair. Tenant hereby agrees to pay Landlord a share, computed as hereinafter provided of the operating costs (as hereinafter defined) of maintaining the common areas and building in which Leased Premises are located. "Operating Costs" shall mean the total cost and expense incurred in operating, maintaining, repairing and replacing the common areas and building in which

---

3. Section 1.3(b) of the lease reads in pertinent part as follows:

Tenant shall also pay, as additional rental hereunder, all taxes, insurance premiums, utility expense, repairs, charges, costs and expenses of every kind and nature relating to the Leased Premises, it being the intention of the Landlord and Tenant that this be a "net, net, net" lease (triple net) to the Landlord during the term of the Lease, with all costs, expenses and obligations of every kind relating to the Leased Premises which may arise or become due during the term of this Lease to be paid by the Tenant and the Tenant agrees to indemnify and hold harmless the Landlord against such costs, expenses and obligations.

Leased Premises are located (but there shall be excluded initial costs of equipment properly chargeable to capital account consisting of items real estate in nature and the original cost of constructing the common areas). Tenants share of such operating costs shall be computed and paid in the same manner as provided with respect to taxes in section 2.2 above, substituting the amount of operating costs for the amount of real estate taxes for the purpose of making such computation.

Our review of the record convinces us that nothing in the record establishes by a preponderance of the evidence that any of the items for which the plaintiff seeks compensation fall within the exclusion set out above. On the contrary, we are of the opinion that the evidence preponderates otherwise. We reverse the judgment of the trial court on this issue.

For the reasons set forth above, the judgment of the trial court is affirmed in part, reversed in part and vacated in part. The case is remanded to the trial court for a determination of the amount of the judgment that should be entered in accord with this opinion. Costs of this appeal are, in our discretion, assessed equally between the plaintiff and the defendants against whom a judgment is obtained.

GODDARD, P.J., and SUSANO, J., concur.