**SHONEY'S, INC.**

v.

**Jim MORRIS**

No. 3–98–0002.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 9, 1999.

Kathryn A. Stephenson, Tuke, Yopp & Sweeney, Nashville, TN, for Shoney's, Inc.

John Edward Quinn, Manier & Herod, Nashville, David M. Duree, Reinert & Duree, P.C., St. Louis, MO, for Jim Morris.

## MEMORANDUM

HIGGINS, District Judge.

Before the Court is the plaintiff's motion (filed July 10, 1998; Docket Entry No. 98)

for summary judgment[1] and memorandum (Docket Entry No. 99) in support; the defendant's response[2] (filed August 10, 1998; Docket Entry No. 121); the defendant's brief (Docket Entry No. 122) in support;[3] and the plaintiff's reply (filed November 6, 1998; Docket Entry No. 165).

The Court has jurisdiction based on diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332(a)(1).

For the reasons discussed below, the motion shall be granted.

## I.

The plaintiff, Shoney's Inc., is a Tennessee corporation which is in the restaurant business and grants franchises to individuals, allowing them to use the Shoney's System to operate restaurants under the Shoney's name. The defendant, Jim Morris, was employed by Shoney's from 1960 through 1984.

In 1984, Mr. Morris entered into his first franchisee license agreement with Shoney's for a restaurant in Kentucky. Between 1984 and 1993, Mr. Morris entered into five additional license agreements so that he had a total of three license agreements for Shoney's restaurants in Illinois and three license agreements for Shoney's restaurants in Kentucky. Mr. Morris closed all six of his restaurants in 1997 without executing the standard termination agreement, which included a mutual release. Shoney's filed this suit against Mr. Morris on January 5, 1998, alleging breach of contract under each of the licenses.[4] Shoney's contends that Mr. Morris closed his restaurants without permission and without executing the termination agreement and owes Shoney's money as to each of the restaurants and damages for future royalties. Mr. Morris contends that Shoney's breached the license agreements first by causing or permitting the decline of the value, reputation, and sales of Shoney's and thus forcing him to close all the restaurants before the license agreements expired. Accordingly, Mr. Morris denies liability under each of the licenses and has filed a counterclaim under the Madisonville, Kentucky, license agreement for breach of contract and fraud.

Shoney's seeks damages under each of the licenses for breach of contract, and also requests prejudgment interest, attorneys' fees, and expenses. Shoney's also moves for dismissal of Mr. Morris' counterclaim and for the preliminary injunction issued by this Court with respect to the sign at the Madisonville, Kentucky, restaurant to be made permanent.[5]

## II.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall

---

1. The plaintiff later filed an amendment to the motion for summary judgment on July 14, 1998 to correct its calculation of damages. (Docket Entry No. 117).

2. In a confusing manner, the defendant has filed an eight page response containing his factual assertions with almost no citations to the record to support these factual assertions and no supporting law. (Docket Entry No. 121). He also filed a brief in opposition which is thirteen pages long and contains case law but asserts only general allegations and facts with little citation to the record. (Docket Entry No. 122).

3. The defendant filed a motion on September 8, 1998 (Docket Entry No. 145), for leave to add supplemental authority to his brief, which the Court granted by order entered November 6, 1998 (Docket Entry No. 161).

4. An evidentiary hearing was held in this case on March 23, 1998, with respect to a motion filed by Shoney's for injunctive relief alleging trademark infringement for a restaurant sign at the Madisonville, Kentucky, store. The Court granted a preliminary injunction in that instance. In this motion for summary judgment, Shoney's requests that the injunction be made permanent.

5. Shoney's states that its claim for injunctive relief regarding the Effingham, Illinois, license agreement is now moot. Plaintiff's motion (Docket Entry No. 98) at n. 1. Accordingly, that claim shall be dismissed.

be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.,* 921 F.2d at 1349; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [6] *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiff's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.,* 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations, but must respond with affirmative evidence supporting its allega-

tions and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip., Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

### III.

#### A. Choice of Law

■ The plaintiff asserts that Tennessee law applies in this case. A federal court applies "the law of the state in which it sits, including that state's choice of law provisions." *Davis v. Sears, Roebuck and Co.,* 873 F.2d 888, 892 (6th Cir.1989). In *Bright v. Spaghetti Warehouse, Inc.,* No. 03A01–9708–CV–00377, 1998 WL 205757, at *5 (Tenn.Ct.App. Apr.29, 1998), the Tennessee Court of Appeals noted that "Tennessee will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." The plaintiff asserts that Tennessee law applies to the Kentucky license agreements because these agreements choose Tennessee law to apply to the contractual relationship of the parties. *See* Declaration of Beverly J. Donahue (filed July 10, 1998; Docket Entry No. 104) exhibit A, ¶ 33; exhibit F, ¶ 33; exhibit H, ¶ 31. Likewise, the Illinois license agreements choose Tennessee law.[7] *Id.*

---

6. The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

7. The Court notes, however, that an addendum to the Effingham, Illinois, license agreement states that

the law regarding franchise registration, employment, covenants not to compete, and other matters of local concern will be gov-

exhibit C, ¶ 33; exhibit D, ¶ 33; exhibit J, ¶ 31.

■ In his response, the defendant cited a long list of cases with no discussion whatsoever as to how these cases support his contention that Illinois law applies to the breach of contract claims on the Illinois license agreements and Kentucky law applies to the breach of contract claims on the Kentucky license agreements and the counterclaim. The defendant later submitted a Seventh Circuit case in which the Court disregarded the choice of law provision in the license agreement, which stated that the contract would be governed by Texas law, and instead held that "Illinois, like many other states, has made it clear that parties cannot opt out of the coverage of the [Illinois Franchise Disclosure] Act for Illinois franchisees." *To–Am Equip. Co., Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 662 (7th Cir.1998).

■ First, the Court notes that, although the defendant submits *To–Am Equip. Co.* for the Court's consideration, he fails to submit any case from Tennessee that holds that the Illinois Franchise Disclosure Act would apply to a breach of contract claim when the license agreement contains a choice of law provision to the contrary. Second, even if the Act were to apply to the plaintiff's breach of contract claim under the Illinois license agreements, the defendant has failed to discuss

> erned by the laws of the State of Illinois; however, as to contractual and all other matters, this agreement and all provisions of this instrument will be and remain subject to the application, construction, enforcement and interpretation under the governing law of the State of Tennessee. Also, the acknowledgments made by the Licensee in Section 35(b) of this Agreement shall not constitute a waiver of liability under the Illinois Franchise Disclosure Act and are void to the extent that they are deemed to be such a waiver.

Declaration of Donahue (Docket Entry No. 104) exhibit J ·at addendum, ¶ 2. The Court does not find that this addendum changes the fact that the plaintiff's breach of contract claim under the Effingham license agreement is governed by Tennessee law.

its application to those license agreements and how it would change the outcome of the claims at issue.[8] Accordingly, the Court will apply Tennessee law to the plaintiff's breach of contract claims under both the Kentucky license agreements and the Illinois license agreements. T h e plaintiff also contends that because Tennessee law applies to the Kentucky license agreements, Tennessee law also applies to the counterclaim as well, since it arises from the Madisonville, Kentucky, license agreement. The comments to Section 201 of the Restatement (Second) Conflict of Laws (1971) state that "questions involving the effect of misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice." The comments go on to say that

> [t]he fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean that a choice-of-law provision contained therein will be denied effect. This will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision.

*Id.See also Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1139–40 (6th Cir.1991) (quoting Section 201 of the Restatement with approval).[9] There has been no allega-

8. The Court recognizes the defendant's assertion that, without waiving his position that Illinois law applies to the Illinois license agreements, he has briefed the issues under Tennessee law. However, the defendant still referenced case law from the Fifth Circuit, Eighth Circuit, Ninth Circuit, California, and Texas, and logically could have cited Illinois and Seventh Circuit case law as well.

9. In *Moses,* the plaintiffs argued that, based on the language of the choice of law provision, the provision only applied to the construction of the contract and not to their claims of fraud and misrepresentation. Mr. Morris in this case does not make such an argument, but the Court has considered the language in the instant case: "The terms of this agreement shall be interpreted and construed in accordance with the laws of the

tion on the part of Mr. Morris that the alleged fraud was responsible for his adherence to the choice of law provision. Accordingly, all the claims in this case will be considered under the backdrop of Tennessee law.

### B. Shoney's Claim

Shoney's moves for summary judgment on its claim that Mr. Morris breached all six of the license agreements by closing his restaurants without permission where the term of the agreements was twenty years. Accordingly, Shoney's claims that it is entitled to not only accounts payable, such as commissary invoices, equipment invoices, shopper invoices, royalty fees, and advertising fees, but also future royalties.

### 1. Mr. Morris' first defense

██ In response, Mr. Morris asserts that "Shoney's breached its six franchise agreements by causing or permitting the decline of the value and reputation of its trade name 'Shoney's,' causing a reduction in sales at both company-owned and franchisee-operated stores." Defendant's brief (Docket Entry No. 122) at 6–7. The defendant contends, therefore, that Shoney's breach relieved him of any obligations under the license agreements and that Shoney's is not entitled to damages. The Court notes that even if a decline in repu-

State of Tennessee." Declaration of Donahue (Docket Entry No. 104) exhibit H, ¶ 31. Although this language is somewhat narrow, the Court recognizes the analysis in *Moses:*

> The plaintiffs are not asserting a noncontractual claim or one that arose incidentally out of the contractual relationship. Rather, they are seeking to avoid enforcement of the contract itself. They put the validity of the contract in issue, and such a claim would appear to be encompassed by the language . . . .

*Moses,* 929 F.2d at 1140. Likewise, in this case, Mr. Morris is not only trying to avoid enforcement of the contract, but is also trying to recover damages by alleging a counterclaim of fraudulent inducement and breach of contract. Mr. Morris is clearly putting the validity of the contract at issue. Accordingly, the Court finds that the counterclaim is also governed by Tennessee law, as indicated by the parties in their choice of law provision.

tation and reduction in sales occurred,[10] the Court is at a loss to discern how this resulted in a breach of contract on the part of Shoney's. Mr. Morris argues that the "franchise agreements require both Shoney's, as the franchisor, and the franchisees to maintain the value and reputation of Shoney's trade name 'Shoney's' by continuing to maintain high standards for food quality, operational execution, service and cleanliness." *Id.* at 6. However, Mr. Morris has failed to point out such a specific requirement on the part of Shoney's in the license agreements.

The first page of each of the license agreements states that the Shoney's restaurants

> and the products sold therein have a reputation for excellence that has been acquired and is being maintained by continuing research and advertising programs and by requiring all parties *licensed to use the Shoney's System* to maintain high standards of quality and service.

Declaration of Donahue (Docket Entry No. 104) at exhibits A (with modification), C–D, F, H, J (emphasis added). From this provision, the Court does not glean any requirement on the part of the franchisor to "maintain high standards for food quality,

10. In support of this allegation, Mr. Morris correctly points out that Shoney's acknowledges in its annual statements and 10–K documents filed with the SEC that the decline in sales is due in part to a decline in operational execution, food quality and service standards. Declaration of Terry Morris (filed August 10, 1998; Docket Entry No. 126) exhibit I at 1251, 1258. Mr. Morris discusses other factors such as Raymond Schoenbaum's proxy contest and his role as vice chairman of the Shoney's board of directors. Defendant's brief (Docket Entry No. 122) at 6. The defendant provides no citations to the record with regard to this discussion. Even if this information was properly referenced, the Court does not understand how any of it supports the defendant's claim that Shoney's breached the six license agreements.

operational execution, service and cleanliness." Defendant's brief (Docket Entry No. 122) at 6.

In his response, Mr. Morris cites to the deposition testimony of Robert Langford, the chief operating officer of Shoney's until April, 1998; Micky Skelton, a senior director of franchise development and administration until April, 1998; and Robert Nicoletti, Shoney's current vice president of franchise operations, in support of his argument that the agreements contained such a requirement. However, when Mr. Langford was asked whether Shoney's had a "corresponding duty to maintain the same high standards of quality and excellence and service for its company-owned stores" as the franchisees, he testified, "I don't see that obligation imposed as a result of that paragraph." Declaration of Terry Morris (Docket Entry No. 126) exhibit E at 47. Mr. Langford went on to say that although he believes that Shoney's had an obligation to maintain a high level of reputation for its company-owned stores, "as it references that paragraph I don't see that duty implied." *Id.*

Although Mr. Skelton and Mr. Nicoletti testified that they agreed that Shoney's had an obligation to maintain the same high standards for quality and service with respect to the company-owned stores, their statements do not mean that such an obligation was a contractual requirement under the license agreements. *Id.* exhibit D at 31; exhibit B at 17–18. The Court will not read such a requirement into these license agreements. *See CMS Enter. Group v. Ben & Jerry's Homemade, Inc.,* [1995–1996 Transfer Binder] Bus. Franchise Guide (CCH) ¶ 10,748 (Pa. Ct. Common Pleas Aug. 3, 1995).[11]

Accordingly, the Court finds that no such requirement exists on the part of Shoney's, the franchisor, in the license agreements and that only the licensees or franchisees are specifically required to "use the Shoney's System to maintain high standards of quality and service." Declaration of Donahue (Docket Entry No. 104) at exhibits A, C–D, F, H, J. As the Court does not find that Shoney's somehow breached the license agreements, the Court finds that there is no genuine issue of material fact on this issue.[12]

### 2. Mr. Morris' second defense

■ Mr. Morris also argues as a defense to Shoney's breach of contract claim that it does not owe Shoney's damages in the form of future royalties because the future royalties clauses in the six license agreements are unenforceable as against public policy, are unconscionable, and fail to meet the reasonable expectations of the parties. The license agreements provide that if the licensee ceases to operate its restaurant, then the licensee shall pay the licensor damages for the right to receive royalty fees for each year remaining on the original term of the agreement. Declaration of Donahue (Docket Entry No. 104) exhibits A, C–D, F, ¶ 20; exhibit H, ¶ 19; and exhibit J, ¶¶ 19(b) and 20(a).

**11.** In *Ben & Jerry's,* the court rejected the franchisee's claim that the franchisor breached a provision by failing to develop and follow appropriate business methods for its franchisees where the provision merely granted the franchisee a license to "establish and operate an ice cream parlor business according to the business methods developed by Franchisor." *Ben & Jerry's,* [1995–1996 Transfer Binder] Bus. Franchise Guide (CCH) at 27,158. The court held that the "plain import of that portion ... referencing 'business methods' is to impose a contractual obligation *on Plaintiffs* to comply with Defendant's established business methods in operating their franchise" and "must be viewed as *obligations* that plaintiffs promised to comply with, not rights they can sue upon." *Id.* (emphasis in original).

**12.** Although the plaintiff also discusses Mr. Morris' allegations regarding the Shoney's commissary, plaintiff's brief (Docket Entry No. 99) at 9, Mr. Morris has failed to even make mention of the commissary in his response to the motion for summary judgment or in his brief. Accordingly, the Court assumes that Mr. Morris no longer has any claims nor relies on any defenses concerning the Shoney's commissary.

First, Mr. Morris argues that "Shoney's used the future royalties clauses to coerce franchisees who cease unprofitable operations to provide it with a full release for causing the franchisees to become unprofitable." Defendant's brief (Docket Entry No. 122) at 8. Thus, Mr. Morris argues that the clauses act as a penalty and are "void and unenforceable, as against public policy, under the law of Tennessee." *Id.* at 9. Mr. Morris cites three cases in support of his argument, but none of these cases discuss future royalty clauses in license agreements.[13]

The plaintiff, however, cites *McGann v. United Safari, Inc.*, 694 S.W.2d 332 (Tenn. Ct.App.1985), in which the Tennessee Court of Appeals enforced the royalties provision in the license agreement. In addition, in *Franchise Management Unlimited, Inc. v. America's Favorite Chicken*, 221 Mich.App. 239, 561 N.W.2d 123 (1997), *appeal granted*, No. 108904 (Mich. Apr. 1, 1998), the court upheld the requirement in the franchise agreement that the franchisee execute a release as a condition to transferring the franchise to another party.

Although Mr. Morris argues that Shoney's policy of requiring a release as part of the termination agreement is not disclosed in the franchise agreement or offering circulars, the Court notes that under the franchise agreement, Shoney's has no obligation to relinquish its right to future royalties. The franchise agreements state that future royalties will be due for the remaining term of the license if a restaurant is closed early. As noted by the plaintiff, the termination agreement simply "represents a modification of the License Agreement." Plaintiff's memorandum (Docket Entry No. 165) at 7. Accordingly, the Court rejects Mr. Morris' argument

that the future royalties clauses at issue are unenforceable as against public policy.

Second, Mr. Morris argues that "the arrangement employed by Shoney's, particularly where the practice of using the termination agreements and mutual releases in this fashion is not disclosed to the franchisees in either the franchise agreements or the offering circulars, is also unconscionable and unenforceable." Defendant's brief (Docket Entry No. 122) at 10. The defendant cites no Tennessee cases on point in support of his argument. He does cite the case of *Postal Instant Press, Inc. v. Sealy*, 43 Cal.App.4th 1704, 51 Cal.Rptr.2d 365 (1996), in which the California Court of Appeals held that the franchisor was not entitled to future royalties where the franchisor, and not the franchisee, elected to terminate the contract instead of merely suing for past unpaid royalties and continuing to maintain the franchise. The court specifically noted that it would not "consider whether a franchisor would be entitled to 'lost future profits' damages if the franchisee rather than the franchisor unilaterally canceled the franchise agreement." *Id.* at 369 n. 2. The court further refused to adopt the franchisee's argument that "it is unfair and uneconomic to force franchisees to remain linked to a sinking franchisor by requiring them to continue paying royalty fees if they elect to terminate the franchise agreement." *Id.* at 375 n. 10. Accordingly, the Court rejects the defendant's argument that the future royalties clauses are unconscionable.

Finally, Mr. Morris argues that "the combination of the future royalties clauses and the termination agreements with the mutual releases are void and unenforceable because the provisions in the standard franchise contract drafted by Shoney's (the

---

**13.** These cases include *Kimbrough & Co. v. Schmitt*, 939 S.W.2d 105, 108 (Tenn.Ct.App. 1996), in which the court held that a liquidated damages provision in a land sale contract was unenforceable. The other cases cited by the defendant, *Brooks v. Networks of Chattanooga, Inc.*, 946 S.W.2d 321, 324

(Tenn.Ct.App.1996) and *Beasley v. Horrell*, 864 S.W.2d 45, 48 (Tenn.Ct.App.1993), also have nothing in common with the facts at hand, as *Brooks* involved a double rent provision in a lease and *Beasley* concerned a cancellation provision in a promissory note.

franchise contracts are non-negotiable) fail to meet the reasonable expectations of the parties under Restatement of Contracts (Second) § 211." Defendant's brief (Docket Entry No. 122) at 10. Mr. Morris simply cites cases from the Eighth Circuit, Ninth Circuit, and the Texas state court with no discussion whatsoever as to how these cases support his position.[14] Nor does the Court understand how these cases support his position after reviewing the cases. The Court finds no justification for the defendant's bald statement that the clauses are void and unenforceable because they fail to meet the reasonable expectations of the parties. Accordingly, the Court finds that the future royalties clauses in the six license agreements are enforceable.

### C. Counterclaim

■ Shoney's also moves for summary judgment on the defendant's counterclaim concerning the Madisonville, Kentucky, license agreement. Mr. Morris states in his response to the plaintiff's motion for summary judgment the following bases for his counterclaim:

In 1990 and 1991, Shoney's represented to Jim Morris and other franchisees that it was continuing to expand the number of Shoney's company-owned and franchised restaurants throughout the United States, aggressively, by adopting Project 500, under which it planned to open 500 new company-owned and franchised Shoney's stores each year for five years.[15] At the same time, Shoney's concealed from Jim Morris that it had entered into the recapitalization program of 1988 because it had concluded that it was in a mature market, that future expansion should be very limited, and that as a result it was paying all of its net worth, and borrowing any additional sums, to make a cash dividend to its shareholders which reduced its net worth from a *positive* $300,000,000.00,

**14.** The defendant cites *Chicago & North Western Transp. Co. v. Emmet Fertilizer & Grain Co.*, 852 F.2d 358, 360 (8th Cir.1988); *Sierra Diesel Injection Serv., Inc. v. Burroughs Corp., Inc.*, 890 F.2d 108, 113 (9th Cir.1989); *Cate v. Dover Corp.*, 790 S.W.2d 559, 565 (Tex.1990).

**15.** The Court notes that, although Mr. Morris alleges that Shoney's represented to him that it was adopting Project 500, under which it planned to open 500 Shoney's stores each year for five years, Mr. Morris provides no citations to the record in support of his allegation. The plaintiff, however, states that "[i]t is undisputed that in 1990 Shoney's adopted a national franchising program, known as Project 500, which continued in effect through 1991. The vision of that project was eventual expansion by 500 restaurants per year of all of the Shoney's Inc., restaurant concepts, including Shoney's restaurants." Shoney's response to defendant's statement of undisputed facts (filed August 24, 1998; Docket Entry No. 131) ¶ 4 (citations omitted). Shoney's cites to exhibits 1 and 2 attached to the third declaration of F.E. McDaniel (filed August 24, 1998; Docket Entry No. 136), but the Court finds no discussion of "Project 500." The plaintiff also cites to Taylor Henry's deposition, exhibit C to the declaration of Terry Morris (Docket Entry No. 126) in which Mr. Henry, who was the chief financial officer of Shoney's during 1990 and 1991, testified that Lynn Roberts, the CEO, had mentioned the "500 Program" at various meetings and explained his "vision" for rapid expansion of the franchisees at a rate of 500 new stores a year. *Id.* at 67–68. The Court also notes, however, that Mr. Morris acknowledges receiving the Uniform Franchise Offering Circular each time before signing the license agreements. Notice of filing (filed July 10, 1998; Docket Entry No. 102) deposition of Jim Morris at 68–69. The 1991 UFOC stated the number of Shoney's restaurants that were opened in 1988, 1989, and 1990, which totaled less than 50 restaurants in each year. The UFOC also stated that Shoney's anticipated opening a maximum of 60 franchises and 17 company-owned restaurants in 1991. Third Declaration of Beverly J. Donahue (August 24, 1998; Docket Entry No. 137) exhibit 4 at 67. *See Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 829 (D.Minn.1989) ("A party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of an applicable offering statement or a subsequently executed contract. In the absence of some factor which would justify plaintiffs' reliance on oral representations which are expressly contradicted in the writings, plaintiffs could not justifiably rely on the alleged misrepresentations without further inquiry.") (citations omitted).

approximately, to a *negative* $379,000,-000.00 approximately.[16] Jim Morris would not have entered into the Madisonville, Kentucky franchise agreement if he had known the concealed, existing, fact that Shoney's had concluded that it was in a mature market, and that future growth should occur very slowly and cautiously.

Defendant's response (Docket Entry No. 121) at 6–7 (emphasis in original).[17]

The plaintiff moves for summary judgment on the grounds that the integration clause in the Madisonville license agreement bars the defendant's counterclaim. The Madisonville agreement provides:

*Entire Agreement.* This agreement and any addendum hereto contains the entire agreement between the parties hereto relating to the operation of the restaurant at the Franchised Site and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, relied upon by the parties other than those set forth herein. No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by all interested parties.

. . . .

IN ADDITION, LICENSEE ACKNOWLEDGES THAT LICENSOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO LICENSEE OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR PROVIDED TO LICENSEE, AND THAT LICENSEE HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR AND LICENSEE'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

Declaration of Donahue (Docket Entry No. 104) exhibit H at ¶¶ 34 and 35(b) (capitalization in original). The defendant cites three cases in support of his argument that "the anti-fraud language in the Madisonville, Kentucky franchise agreement does not bar the fraud counterclaim." Defendant's brief (Docket Entry No. 122) at 5. However, all of these cases are product liability cases, and their applicability to the facts in this case is limited.[18]

The plaintiff, on the other hand, cites to *Sub Station II. Inc. v. Banasiak,* 1984 Tenn.App. LEXIS 2962 (Tenn. Ct. App. June 15, 1984), in which the franchisee alleged that the franchisor fraudulently induced him to enter the agreement based on an oral representation that an

---

**16.** Again, Mr. Morris provides no citation to the record in support of this allegation that Shoney's concealed its 1988 recapitalization program. To the contrary, the Court notes that Mr. Morris received a memorandum from Shoney's in April of 1988 which discussed the 1988 recapitalization and let Mr. Morris and the other franchisees know that growth would be at a "slower pace," that Shoney's was operating in a "mature marketplace," that "it would be difficult to achieve the long-term growth rate anticipated by many shareholders," and that there would be a "significantly reduced store expansion program." Declaration of Terry Morris (Docket Entry No. 126) at exhibit S. In another memorandum to franchisees dated August of 1988, Shoney's attempted to answer questions "[a]s the reality of how we must operate under the debt of recapitalization soaks into your view of our future relationship" and stated that "[w]e have already cut back in most of these areas [of service to franchisees like marketing, architecture, and equipment] relating to our own slower growth...." *Id.* at exhibit T.

**17.** As Mr. Morris makes no mention of any other grounds for his counterclaim in either his response or in his brief, the Court will address the above grounds only.

**18.** The cases cited by the defendant are *Agristor Leasing v. Saylor,* 803 F.2d 1401, 1406–08 (6th Cir.1986); *Walker Truck Contractors, Inc. v. Crane Carrier Co.,* 405 F.Supp. 911, 917 (E.D.Tenn.1975); and *Vicon, Inc. v. CMI Corp.,* 657 F.2d 768, 775 (5th Cir.1981).

attempt was being made to franchise many stores in the area so that the stores could jointly advertise and buy food at a lower cost. *Id.* at \*26–27. The court held:

> If testimony is offered to prove that a party to the written integration made extrinsic promises, warranties, or other undertakings by which his duties, liabilities, or other kinds of burdens would be increased, without any consideration other than that which is expressed in the writing, the testimony is ordinarily said to be excluded by the "parol evidence rule." Parties would ordinarily include such additional promises and warranties, if in fact made, in the writing itself. They form part of the equivalent, bargained for and given in exchange for the express consideration; and the purpose for which the parties execute the writing is to state what the bargain was.

*Id.* Moreover, in *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir.1998), the Fourth Circuit held that the franchisees did not have a claim for breach of fiduciary duty where no special duties were owed by the franchisor beyond the terms of the contract and the contract contained an integration clause. The Court noted that the integration "clause emphasizes that the nature of the franchise relationship at issue here is to be determined by reference to the written contractual instrument that both parties signed, discouraging the imposition of extra-contractual obligations based upon the welter of conflicting oral statements and representations that plaintiffs introduced at trial." *Id.* at 347. Based on the above case law, the Court finds that the integration clause in the Madisonville license agreement precludes the admission of alleged representations made by the plaintiff.[19] Accordingly, the Court will grant the plaintiff's motion for summary judgment on the defendant's counterclaim.[20]

### D. Damages

The plaintiff requests damages for accounts due in the amount of $91,823.92. The defendant admits in his response to the plaintiff's statement of undisputed facts (filed August 10, 1998; Docket Entry No. 123) that

> he did not pay invoices totaling $91,-823.92 for commissary charges, royalties and advertising charges on his six franchise stores, following the closing of those six stores, as reflected in the second paragraph/schedule of Statement No. 65, but disputes that he owes these amounts because Shoney's owes him a far greater amount for causing his six stores to become unprofitable and forcing him to close.

*Id.* ¶ 62. As the Court has found that Mr. Morris' defense that Shoney's breached the license agreements first is without merit and as Mr. Morris concedes that he owes $91,823.92 for accounts due on the six franchise stores, Shoney's shall recover

---

**19.** The Court notes, however, that even if the oral representations were admissible, the integration clause renders reliance on the representations to be unreasonable. *See Hardee's of Maumelle, Arkansas, Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir.1994) (holding that "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying" by signing a licensing agreement that contains an integration clause which is understood by the franchisee); *Elias Bros. Restaurants, Inc. v. Acorn Enters., Inc.*, 831 F.Supp. 920, 925 (D.Mass.1993) (holding that the franchisees' reliance upon prior oral representations of plans to expand the chain was unreasonable as a matter of law where "any and all earlier oral promises or representations were ex-

pressly disclaimed"); and *Schubot v. McDonalds Corp.*, 757 F.Supp. 1351, 1356 (S.D.Fla.1990), *aff'd*, 963 F.2d 385 (11th Cir. 1992) ("Any reliance on the [franchisor's] alleged misrepresentations is unreasonable because the statements were not contained in the subsequent, written agreement.").

**20.** The defendant also argues that "the evidence establishes a submissable counterclaim for punitive damages." Defendant's brief (Docket Entry No. 122) at 12. As the Court grants summary judgment in favor of the plaintiff on the defendant's counterclaim, the defendant's request for punitive damages is moot.

$91,823.92 from Mr. Morris for accounts due.

The plaintiff also requests damages for future royalties in the amount of $1,261,-026.00. As the Court has found that Mr. Morris' defense that the future royalties clauses are unenforceable is without merit, Shoney's is entitled to future royalties. However, as Mr. Morris has not stated whether he has any opposition to the amount requested for future royalties, the defendant shall file a response to the plaintiff's request for future royalties in the amount of $1,261,026.00.

Furthermore, the plaintiff requests prejudgment interest,[21] as well as attorneys' fees and expenses, but has not briefed these issues. Accordingly, the plaintiff shall file a memorandum in support of its request for prejudment interest. The plaintiff shall also file an application for attorney fees and expenses in accordance with Rule 13(e), Local Rules of Court.

### E.  Injunctive Relief

■ The plaintiff also requests that the "preliminary injunction entered with respect to the sign at the Madisonville restaurant be made permanent." Plaintiff's memorandum (Docket Entry No. 99) at 20. The defendant responds that "[t]he no-compete clauses, however, expire one year after the franchise contracts are terminated," and thus, a permanent injunction should not be granted. Defendant's brief (Docket Entry No. 122) at 12.

It is true that Paragraph 18 of the Madisonville license agreement is a non-competition provision and essentially states that the licensee agrees that it will not engage in any food service business similar to the food service business operated under the Shoney's System within two and a half miles of a Shoney's restaurant for a period of 12 months. Declaration of Donahue (Docket Entry No. 104) exhibit H, ¶ 18. However, Shoney's does not ask the Court to extend the time under this non-competition provision. Shoney's simply asks the Court to make permanent the preliminary injunction the Court granted as to the sign at the Madisonville restaurant.

In the Court's memorandum granting the preliminary injunction (entered April 8, 1998; Docket Entry No. 54), the Court noted that it was paragraph 20 of the license agreement that was at issue. Paragraph 20 states that the "[l]icensee shall ... discontinue at the Franchised Site all use of the trade names, trademarks and service marks which are connected with the Shoney's System, and the use of any and all signs ... bearing such trade names, trademarks and service marks, or any reference whatever thereto." Declaration of Donahue (Docket Entry No. 104) exhibit H, ¶ 20. That same provision also prohibits the licensee from assisting a nonlicensee "in the construction or equipping of any premises incorporating the distinctive features" that Shoney's has originated and developed and which are identifying characteristics of the business. Id.

By enforcing this provision and making the preliminary injunction permanent, the Court does not prohibit Mr. Morris from opening a restaurant at the site of the Madisonville restaurant. The permanent injunction simply prohibits Mr. Morris from resurrecting the BROADY'S road sign at the Madisonville restaurant, which mirrored the Shoney's sign in color, font and arrangement of the letters and was the subject of the preliminary injunction. Accordingly, the preliminary injunction granted by order of this Court entered on April 8, 1998 (Docket Entry No. 55), will be made permanent.

### IV.

The Court finds that there is no genuine issue of material fact as to the defendant's

---

21. Under Tennessee Law, Shoney's appears to be entitled to prejudment interest. See Tenn.Code Ann. § 47–14–123.

liability under the six license agreements for breach of contract or as to the future royalties clauses under the six license agreements. The Court also finds an absence of a genuine issue of material fact as to the defendant's counterclaim against the plaintiff. Accordingly, for the reasons stated above, the plaintiff's motion for summary judgment shall be granted on its claims against the defendant and on the defendant's counterclaim against the plaintiff.

In addition, the Court finds that Shoney's shall recover from Mr. Morris $91,823.92 for accounts due under the six franchise agreements. The Court also finds that the future royalties clauses in the six franchise agreements are enforceable, and thus, Mr. Morris shall file a response to the plaintiff's request for future royalties in the amount of $1,261,026.00. The plaintiff shall file a memorandum in support of its request for prejudgment interest and an application for attorneys' fees and expenses in accordance with Rule 13(e), Local Rules of Court.

Finally, the Court finds that the preliminary injunction granted by this Court's order of April 8, 1998 (Docket Entry No. 55) shall be made permanent.[22]

An appropriate order shall be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the plaintiff's motion (filed July 10, 1998; Docket Entry No. 98) for summary judgment on its claims[1] against the defendant and the defendant's counterclaim against the plaintiff is granted.

Accordingly, Shoney's shall recover from Mr. Morris $91,823.92 for accounts due under the six franchise agreements. Mr.

Morris shall file a response to the plaintiff's request for future royalties in the amount of $1,261,026.00. The plaintiff shall file a memorandum in support of its request for prejudgment interest within ten (10) days of the date of entry of this order on the docket. The plaintiff shall also file an application for attorney fees and expenses in accordance with Rule 13(e), Local Rules of Court. Finally, the preliminary injunction granted by this Court's order of April 8, 1998 (Docket Entry No. 55) is made permanent.[2]

It is so ORDERED.

---

**22.** Shoney's claim for injunctive relief regarding the Effingham, Illinois, license agreement shall be dismissed as moot.

**1.** Shoney's claim for injunctive relief regarding the Effingham, Illinois, license agreement is dismissed as moot.

**2.** This order shall not constitute the judgment in this action. Judgment shall be entered once the issue of future royalties is resolved.