# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE

## FILED

October 18, 1999

Cecil Crowson, Jr.

Appellate Court Clerk

| | | |
|---|---|---|
| CHATTANOOGA ASSOCIATES, LIMITED PARTNERSHIP, | ) ) ) | 03A01-9901-CH-00021 |
| Plaintiff/Appellee | ) ) | Appeal As Of Right From The HAMILTON CO. CHANCERY COURT |
| vs. | ) ) | |
| CHEROKEE WAREHOUSES, INC., | ) ) | HON. HOWELL N. PEOPLES, CHANCELLOR |
| Defendant/Appellant | ) | |

**For the Appellant:**
Frank P. Pinchak
WITT, GAYTHER & WHITAKER, P.C.
1100 SunTrust Bank Building
736 Market Street
Chattanooga, TN 37402-4856

**For the Appellee:**
Bruce C. Bailey
CHAMBLISS, BAHNER & STOPHEL, P.C.
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402

REVERSED and REMANDED

Swiney, J.

# **O P I N I O N**

This is an appeal from an Order of the Chancery Court of Hamilton County awarding

Plaintiff $46,249.47 for the cost of construction (repaving) on the parking lot of a storage warehouse which Chattanooga Associates Limited Partnership ("Plaintiff") leased to Cherokee Warehouses, Inc. ("Defendant"), plus late fee and attorney's fees, under the terms of the Lease, for a total judgment of $71,288.77. Defendant appeals, and raises these issues:

1. Whether the Chancellor Erred in Refusing to Bar Recovery by Virtue of the Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing.

2. Whether the Chancellor Erred in Concluding that the Defendant was liable under the lease agreement with the Plaintiff for its share of the paving "repairs."

3. Whether the Chancellor Erred in Awarding a 15% Late Charge.

For the reasons stated in this Opinion, we reverse the judgment of the Trial Court and remand the case to the Trial Court for further proceedings in accordance with this opinion.

## BACKGROUND

Cherokee Warehouses, Inc. is in the public warehouse business. It owns 18 warehouses (three million square feet) and leases other warehouses. In August 1992, it leased 56% of a warehouse owned by Chattanooga Associates, Ltd. In March 1993, Cherokee expanded its occupancy to 79% of the space. The other 21% of the space in that warehouse was subject to an ongoing lease to Red Food Stores. The Lease Agreement between Cherokee and Chattanooga Associates provides, as pertinent:

1. Payment of Rental; Tenant's Proportionate Share.
. . . Tenant covenants and agrees to pay the rent herein reserved and each installment thereof promptly when and as due, together with all other sums, reimbursements, costs, fees, charges and expenses required to be paid by Tenant to Landlord from time to time hereunder, all of which shall be deemed additional rent hereunder.

13. Repairs; Maintenance and Common Areas.
(f) To the extent Landlord elects to perform or otherwise performs any maintenance or repairs on the building, or the land on which the building is situated, including but not limited to, landscaping, grass cutting, resurfacing of paved areas, removal of snow or ice from paved areas, etc., Tenant agrees to pay its proportionate share (as defined in Section 1) of the costs incurred by Landlord therefor, within ten days of demand therefor by Landlord, which demand shall be accompanied by an invoice indicating the maintenance and repairs undertaken by Landlord in regard to such areas, the cost incurred in connection therewith, and Tenant's

breakdown of Tenant's proportionate share thereof.

\* \* \*

16. Default.

(b) In the event of any default (as defined in subsection [a] above), Landlord, in addition to any and all legal and equitable remedies it may have, shall have the following remedies:

\* \* \*

. . . In the event Landlord brings any action against Tenant to enforce compliance by Tenant with any covenant or condition of this Lease, including the covenant to pay rent, Tenant shall promptly reimburse Landlord for all costs and expenses incurred by Landlord in bringing, defending and/or prosecuting such action, including, but not limited to, attorneys' fees.

(c) In the event Tenant fails to pay Landlord any payment of rent (basic or additional) due hereunder within 10 days from the date on which any such payment was due, in addition to all other rights and remedies hereunder or at law or in equity to which Landlord may be entitled, Landlord may at Landlord's option charge Tenant a late charge equal to 15% of the payment or other such charge, which charge shall be payable by Tenant to landlord within 5 days of demand therefor.

In early fall of 1994, Red Food Store employees contacted Plaintiff's general manager, Pete Smith, and complained about a large pothole outside the portion of the warehouse occupied by Red Food. Plaintiff contacted a large real estate developer in Chattanooga, CBL (the owner of Hamilton Place Mall), and asked for the name of a qualified civil engineer. Plaintiff was referred to Charles Miller, a licensed civil engineer with special experience in grading, water, pavement design, roadway design, drainage, and parking lots, who had designed the parking lots for Hamilton Place Mall. Plaintiff told Miller it had a warehouse, ". . . and that the parking lot was failing, potholes and those kinds of things, would I go out and look at it and give her a contract to come up with -- to mitigate the failures in the asphalt at this location."

Miller sent a proposal to Plaintiff, dated and faxed on October 21, 1994. He advised that the pavement failures should be filled and re-paved, then the whole parking lot should be paved over. The primary reason for these failures was water getting into the subgrade. It was Miller's opinion that if they just repaired the cracks and didn't repave the whole area, then the joints where new asphalt and old asphalt join ("cold seams") would develop leaks, and the repair would have to be done over.

Also, Miller felt the concrete trailer pads should be extended by at least eight feet and concrete pads should be installed for the dumpsters because the lack of pads had caused tractor-trailers and dumpster trucks to punch holes in the asphalt. Miller also noticed tracks in the grass and recommended that bollards[1] be installed to keep trucks off the grass. His cost estimate for the recommended work was $75,000, and his fee for the plans and specifications was $5,000, including the cost of receiving bids and periodic inspection. Plaintiff accepted Miller's proposal by signing the proposal letter the same day.

Miller testified that he had never been to the property before he was asked to quote and supervise this job, and he had no idea of its condition in 1992, when these parties entered into their lease agreement. When the project started, he did not have any formal discussions with the tenants but, as a passing courtesy, he stopped by and spoke to someone, whose name he does not know, about the fact that they were going to be digging and they would work with the tenants in getting the trucks in and out. Although they doubled the size of the concrete pads, if they had not put down new concrete, they still would have put down new asphalt because there were holes in the pavement where the truck stanchions were too big and overshot the existing pads. Although the project improved the value of the property, Miller regards the job as a maintenance and repair job, not a new construction project, and thinks that any repairs will improve the value of any property.

The Trial Judge asked Miller whether he could produce a breakdown of what it would cost just to repair the potholes, eliminate the increased dolly areas, eliminate the pads for the dumpsters, and eliminate the bollards, and Miller replied that it could be done.

Susan Katzenberg, one of the two general partners of the Plaintiff (the other partner is her father), testified that the partnership acquired this property from the developer when the warehouse was one or two years old, in 1976. In April or May of 1992, when the partnership's realtor was negotiating a lease agreement with Defendant, she talked with Jim Kennedy of Cherokee Warehouse by phone because the realtor told her there were some issues preventing the closing of the lease. She told Kennedy that she wanted to go over point by point any of the issues that were of concern to him. He replied that his father had found their lease cumbersome and didn't want to hire a lawyer to go over it, so

they had found some other warehouse property and had signed a much shorter lease on it. However, Kennedy did not think the lease itself was particularly an issue, and perhaps they would need more space later and would lease from her.

On August 27, 1992, Defendant did sign a lease with Plaintiff. That lease was amended twice because Defendant increased their rental space from 56% to 79% and because Defendant wanted to reduce the term of the lease from one-year to month-to-month. Plaintiff viewed Defendant as being there on a short-term lease, providing current income to Plaintiff while it continued to actively market the property for a long-term tenant. Plaintiff doesn't view Defendant as a short-term tenant in hindsight, since it actually stayed there three years. Counsel for Defendant asked Ms. Katzanberg whether the work done under the repaving contract would have enhanced the marketability of the property to potential long-term lessees, to which she replied, "Not necessarily. Possibly." If Plaintiff had had an offer from a long-term lessee, it would have given Cherokee notice to move out.

Ms. Katzenberg testified that she decided to repave the parking lot because Red Food complained about the potholes. She went out to the parking lot and looked at the problem, and because the failure was fairly extensive, she hired Miller to plan and supervise the job. She entered the contract to repave on December 20, 1994. The work started that day and ended the last week in January 1995. She sent a letter to Defendant on December 28th notifying them that the work would be done. Ms. Katzenberg did not consider notifying the Defendant before then, as it was her view that the work needed to be done, Defendant was required to pay for it under the lease terms, and prior notice to Defendant was not required. She billed Red Food for its portion (21%) of the contract in its annual bill for additional rent under the terms of the lease, and Red Food paid its bill. When she sent the bill to Defendant for its 79% of the contract as part of its annual bill for additional rent, Defendant refused to pay for the work, but paid for the other annual charges. Defendant then gave Plaintiff 60 days notice and moved out of the warehouse in May 1995, not having paid the $55,866.22. Plaintiff incurred $6,400 in attorney fees for the law firm of Ballard-Spahr in Baltimore and $11,000 for the law firm of Chambliss-Bahner in Chattanooga in attempting to collect the debt from Defendant, plus expenses.

David Holt, CPA, whose accounting firm does work for Defendant, testified that he reviewed the history of the repaving project at Defendant's request, and opined that, from both a financial and an accounting standpoint, and from a tax return filing standpoint, the expenditures that were made would constitute capital additions rather than repair items. His opinion was based on generally-accepted accounting principles and income tax law and regulations, IRS rulings and case law, which hold that "a capital item is one that would appreciably prolong the useful life of an asset or materially enhance its value, arrest deterioration and prolong the life [of the capital asset]."

Jim Kennedy, President of Cherokee, testified that his company owns 18 warehouses and leases others (13 or 14 at the time of this controversy) from owners, as well as leasing to tenants the 18 buildings it owns. In his business, Mr. Kennedy makes it his policy to know about the (competing) warehouse space available in the area, and he has known of this particular warehouse for 20 years or more. There are three warehouses close together, and in the 1970s his company leased each of the other two briefly. His general impression is that the buildings and the pavement around them have been pretty much the same over the 20 years. During the time Defendant leased the building in this suit, it was paying a reduced rental rate because the space was still being shown to potential long-term tenants and Defendant knew it could be moved out on short notice. The agreement was mutually beneficial. Defendant got a good rental rate ($1.80 per sq. ft. vs. $2.65 per sq. ft.), and Plaintiff got some income from a short-term tenant while trying to find a long term tenant. Both parties "understood that this was a short-term arrangement."

Kennedy testified that he saw little, if any, difference in the condition of the parking area from the time Defendant first leased it in September 1992 until it was repaved in January 1995. He may have seen one or two potholes. If Jane Katzenberg had told him, in October 1994, that she was planning to commence this project in December and then bill him for it, he would have "found a way to get out of the building."

Pete Smith, thirty-plus year employee and warehouse manager for Defendant, testified that he had managed this warehouse during the entire time that Defendant leased it from Plaintiff. When

Defendant moved in, there were two potholes in the pavement. One was large - "probably a three-foot square." The warehouse had flooding problems when it rained. Tractor-trailer drivers sometimes wouldn't drop their trailers at the Defendant's site because they didn't want to get their feet wet.[2] There was a problem with the truck pads, which were originally designed in 1976 for trailers 45 - 48 feet long, but when the regulations changed allowing trailers to be longer, the pads were too short.

Bob Hellerstedt, thirty-plus year employee for Defendant, testified that he first looked at the warehouse with the realtor in 1992. At that time, it had been sitting empty and Plaintiff was trying to find a long-term tenant. He inspected the building and the pavement before Defendant leased it, and could state the condition of the pavement at the time they leased it and at the time the Kitzmiller-Murray repaving contract was undertaken. He said,

> Well, I think, as Pete said, it didn't change that much. There were some potholes or holes around those dolly pads, especially over around the Red Food section and on down on the other end. But, for the most part, the general area was in pretty decent shape . . . it [the potholes] was there when we moved in there . . . it's one thing to patch a pothole, but when you start a general improvement project where you're changing the slopes of the lot itself to improve the thing, which it did, I mean, the work did that, we didn't have to wade in any more after that happened when it rained, but that was – that's certainly not repair in my mind . . . [d]own closer to the building, I guess they raised that elevation, the pavement itself, I would say maybe as much as five or six inches.

## DISCUSSION

The Trial Court found that the lease agreement provided that Defendant was leasing the space "as is," and that Defendant would pay its proportionate share of "any maintenance or repairs." Defendant occupied the space for three years, and after two of those years, Plaintiff investigated the possibility of making repairs to the parking lot. An engineer (Miller) made recommendations for the repairs, and those recommendations were carried out. Defendant occupied 79% of the warehouse space, and they were billed for 79% of the cost of the repairs.

The Trial Court found that the work done in this case involved both repairs and improvements. The Trial Court ordered that Plaintiff is entitled to recover from Defendant the cost of

necessary repairs but is not entitled to recover enhancements or improvements, such as the enlargement of pads, installation of new pads, and installation of bollards. The Trial Court then referred the matter to a special Master to determine the cost of reasonable repairs solely of the potholes and cracks in the parking lot, with 79% of the cost to be borne by the Defendant. Other costs, including attorney fees, were to be decided after the Master had made his determination.

On February 11, 1999, the Master filed his report, indicating that the matter was submitted to him upon stipulations of the parties. The apparent stipulation (prepared by counsel for Plaintiff but not signed by either party, and appended as Exhibit 1 to the Master's Report) stated that Defendant owed Plaintiff $46,249.47, before fees, costs, or interest. The Trial Court adopted this "finding" and enforced against Appellant the contract provisions for attorney fees and a 15% late fee on failure to pay for the repairs.

Our review is de novo upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Lindsey v. Lindsey*, 976 S.W. 2d 175,178 (Tenn. App. 1997). The interpretation of a written agreement is a matter of law and not of fact. Therefore, as to matters of law, our scope of review is de novo on the record with no presumption of correctness of the Trial Court's conclusions of law. *Park Place Center Enterprises v. Park Place Mall Associates*, 836 S.W. 2d 113, 116 (Tenn. App. 1992). *Park Place* also described the general principles of contract interpretation:

> The cardinal rule of interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles. In construing contracts, the words expressing the parties intentions should be given their usual, natural, and ordinary meaning.

Defendant first asks this Court to reverse the decision of the Trial Court and bar the Plaintiff's recovery because the Plaintiff "was under a duty to disclose her secret plan to construct extensive improvements, and she failed to do so." Defendant contends the Plaintiff's conduct clearly violated the implied covenant of good faith and fair dealing, citing *Winfree v. Educators Credit Union,*

900 S.W.2d 285 (Tenn. App. 1995)(*perm. app. denied*), and *Covington v. Robinson,* 723 S.W.2d 643 (Tenn. App. 1986) (*perm. app. denied*).

In *Winfree,* plaintiff entered into a "Memorandum of Understanding" with Educators Credit Union in which he agreed to act as an unpaid marketing representative for ECU in consideration for the opportunity to sell cancer insurance to ECU's members. As policies were sold, payments for those policies were deducted from the payroll checks of credit union members. Four years later, under a new administration, ECU cancelled the payroll deductions for Winfree's insurance policies, causing a number of ECU members to cancel their policies. In determining whether ECU had violated its "contractual obligation of good faith and fair dealing," this Court stated that:

> There is an implied undertaking in every contract on the part of each party that he will not intentionally or purposely do anything . . . which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promissee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.

*Winfree* at 289, citing Section 256 of American Jurisprudence, Second Edition, on Contracts.

Our Supreme Court discussed the nature of the duty of good faith in *Wallace v. National Bank of Commerce,* 938 S.W.2d 684 (Tenn. 1997):

> In Tennessee, the common law imposes a duty of good faith in the performance of contracts. This rule has been considered in several recent decisions of the Court of Appeals. The law regarding the good faith performance of contracts was well stated by the Court of Appeals in *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn. App. 1987):
>
> It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.
>
> In *Covington v. Robinson,* 723 S.W.2d 643, 645-46 (Tenn. App. 1986), which was relied upon by the Court of Appeals in *TSC*

*Industries,* the Court of Appeals held that in determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the instrument. In a later decision, the Court of Appeals held that good faith in performance is measured by the terms of the contract. "They [the parties] may by agreement, however, determine the standards by which the performance of obligations are to be measured." *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 91 (Tenn. App. 1988).

\* \* \*

In this case . . . the language of the agreements clearly states the terms and reflects the intent of the parties . . . . *Performance of a contract according to its terms cannot be characterized as bad faith.* [emphasis added]

\* \* \*

. . . it should be noted that the common law duty of good faith in the performance of a contract does not apply to the formation of a contract. *See* Restatement (Second) of Contracts, § 205 cmt. c (1979). Consequently, the common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties. [citations omitted]

*Wallace* at 687.

For Defendant to prevail on this issue, it must prove that the Plaintiff's actions were not a performance of the contract according to its terms. This is particularly true in this case where the parties to the contract are two experienced commercial entities.

By the testimony at trial and the purported stipulation of the parties, the Plaintiff constructed bollards, concrete pads and extensions to concrete pads, and billed the new construction to the Defendant as "repairs." Under *Wallace,* if Plaintiff's actions in making the "repairs" without notifying the Defendant beforehand was consistent with the performance of the contract according to its terms, the Plaintiff's actions cannot be characterized as bad faith and Plaintiff cannot have breached its duty of good faith and fair dealing. The contract gave the Plaintiff the option to elect to perform "any maintenance or repairs. . ." as it saw fit. The contract placed no requirement on the Plaintiff to notify the Defendant before undertaking any such "maintenance or repairs." If Defendant had wished such a requirement be placed on the Plaintiff, it could have negotiated that issue with the Plaintiff and insisted that such a provision be included in the contract. No such provision requiring notice was included. It is the opinion of this Court that the Trial Court did not err in refusing to bar recovery by virtue of the

alleged breach by the Plaintiff of the implied covenant of good faith and fair dealing.

Defendant next argues that the Chancellor erred in "concluding that the construction project was not a capital improvement." The real issue before the Trial Court and this Court is whether or not the work Plaintiff had performed constituted "maintenance and repairs" under the contract between the parties. The Trial Court did find that some of the expenses were for improvements. Kitzmiller-Murray's invoice to Chattanooga Associates for the work done was for $79,950.65, of which $9,233.92 was charged to a neighbor whose easement was also paved, leaving $70,716.73 owing from Chattanooga Associates to the contractor. Excluding the cost of concrete dolly pads ($21,045.69) and bollards ($790) from that the amount left $48,881.04 due by the tenants under the Plaintiff's theory. Defendant's 79% of that amount would be $38,616.02. However the apparent stipulation upon which the Master relied includes an additional $8,072.51 for "square yard of asphalt for dolly pad repair" upon which there was no testimony and which was not included in any of the bills in the record. Considering all of this, we are unable to verify by the record or our calculations that Cherokee owes $46,249.47 rather than, at most, $38,616.02, for repairs.

Moreover, we find no evidence in the record that the apparent stipulation includes any consideration of the cost of raising the pavement height so that it would be above the water level during storms, as recommended by Charles Miller and apparently as actually done in the repaving, according to the testimony of Bob Hellerstedt. As previously discussed, the original quote letter from Miller to Katzenberg, which described his inspection of the parking lot, begins with the observation: "Dear Ms. Katzenberg: As you know your warehouse is in a low area and has high ground water table. . . . During the last substantial storm event the water level in the structure was the same as the ponds across the railroad tracks. Therefore, even if we improve your on-site drainage there is no apparent outlet to drain the water away from the site." The letter discusses measures to improve drainage, add bollards, add concrete pads, enlarge concrete pads and repair the areas that have failed, all of which was done. It is uncontested on appeal that some of these measures were improvements, not repairs.

The determinative factor in this appeal is the contract between the parties itself. What

was it that the Defendant contractually agreed to pay?  The contract answers that question, and the answer is that the Defendant agreed to pay its proportionate share of the costs incurred by the Plaintiff for maintenance and repairs.  Under Plaintiff's interpretation of this contractual provision, it could have had this parking lot construction work done the day after the contract was signed and  Defendant, an admittedly short term tenant, would have been responsible for its proportionate share of those expenses.  This Court is of the opinion that such was not the intention of the parties as reflected in the contract.

The contractual obligation to pay for repairs imposes an obligation merely to keep the premises in as good a repair as they were when the lease was entered into.  *Taylor v.  Gunn,* 227 S.W.2d 52, 56 (Tenn.  1950).  The definition of "improvement" has been discussed by this Court in *Memphis Light, Gas & Water Div.  v.  T.  L.  James & Co. ,* Tenn.  App.  No.  52, filed October 17, 1986, (*no appl. perm app).*

> Black's Law Dictionary, 5th Ed.  (1979) defines the term "improvement" as follows:
> **Improvement:** A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or **utility or to adapt it for new or further purposes.**  Generally, buildings, but may also include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc.  [emphasis added]
>
> This definition of "improvement has been adopted in its totality as Section 1 of 14 Tenn.  Juris., Improvements (1984).

*Memphis Light, supra.*

This Court has previously discussed improvements and repairs under the terms of a lease contract which provided that the lessee pay for repairs:

> Common sense dictates that maintenance, such as painting the structure and resealing the parking lot adds to the physical life of the building, yet without question these activities are no more than ordinary maintenance.  We are further of the opinion that replacement of damaged awnings as opposed to the installation of new awnings falls within the purview of maintenance.  Such activities are nothing more than expenditures which are required to keep the building in a state of good repair.

*Brooks v.  Networks of Chattanooga, Inc.,* 946 S.W.2d 321, 328 (Tenn.  App.  1996).

*Brooks* does not support the Plaintiff's position in this case.  The controlling language in

the lease in *Brooks* is considerably broader than in the case currently before us. Specifically, the lease in *Brooks* required the tenant there to pay its pro rata share of the "operating costs" of maintaining the common areas and building. The lease in *Brooks* defined "operating costs" as ". . .the total cost and expense incurred in operating, maintaining, repairing and replacing the common areas and building in which Leased Premises are located. . ." There is no corresponding language in the lease in the case now before us that requires Defendant to be responsible for its pro rata share of "replacing" the area in question. Additionally, the controlling language of the lease in *Brooks* was absolutely clear that it was the parties' intention that that lease be a "triple net" lease to the landlord during the term of the lease so that the tenant was responsible to pay ". . .*all* costs, expenses and obligations of *every kind* relating to the Leased Premises which may arise or become due during the term of this Lease. . ." [emphasis added]. The lease in question before this Court in this appeal contains no such language.

In this case, the evidence in the record is insufficient to determine on appeal whether the expenses apportioned to Cherokee under the lease were for repairs or for improvements or replacements. Although the Master incorporated a purported stipulation in his findings, the stipulation document itself is unclear. We cannot tell from the record before us which of the construction expenses were necessary to put the premises in as good of repair as when the lease was entered into and which were improvements or replacements which resulted in the premises being put in better condition than at the time the lease was entered into by the parties.

"Even though [Appellant] has not questioned the Trial Court's damage calculation on appeal, we have the responsibility to apply the controlling law whether or not cited or relied upon by either party." *McClain v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 201 (Tenn. App. 1990)(*perm. app. denied*). As in *McClain,* "while we favor the conservation of the judicial resources, we do not have sufficient evidence to calculate" the cost of repairs vs. improvements/replacements in this case. *Id* at 201.

We reverse the judgment of the Trial Court and remand the case to the Trial Court to determine what amount of the construction expense was necessary to keep or place the premises in as

good a condition as they were in when the lease was entered into by the parties. In keeping with the parties' contract and the Order of the Trial Court, 79% of the expenses determined to be repairs as defined above shall be apportioned to Defendant.

In light of our holding above, the Chancellor's award of a 15% late charge was in error. Since some of the expenses charged to the Defendant by the Plaintiff were not proper under the lease as repairs, the Defendant was justified in refusing to pay the bill within the time specified by the contract. A landlord cannot trigger a late fee provision by sending an inflated bill which the tenant rightfully refuses to pay, as such an attempt would be a violation of the implied covenant of good faith and fair dealing as discussed earlier in this Opinion.

## <u>CONCLUSION</u>

The judgment of the Trial Court is reversed and the case remanded to the Trial Court for further proceedings consistent with this Opinion. Costs of this appeal are assessed to the Appellee.

_____
D. MICHAEL SWINEY, J.

CONCUR:

_____
HERSCHEL P. FRANKS, J.

_____
CHARLES D. SUSANO, JR., J.